MISSOURI, K. & T. RY. CO. OF TEXAS v. ANDERSON. (No. 5806.)

(Court of Civil Appeals of Texas. Austin. Oct. 24, 1917. Rehearing Denied Nov. 28, 1917.)

1. EVIDENCE ⬅126(2) — "RES GESTÆ" — WHAT CONSTITUTES.

When a person is rendered unconscious by an injury, and as soon as consciousness is restored makes a statement as to how the injury occurred, such statement possesses as much spontaneity, and is regarded a much a part of the transaction which resulted in the injury, as if it had been made at the time or immediately thereafter, and for that reason such statements are admitted in evidence as part of the res gestæ.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Res Gestæ.]

2. EVIDENCE ⬅128½ [New, vol. 17 Key-No. Series]—RES GESTÆ—WHAT CONSTITUTES—DISCRETION OF COURT.

Admission of statements of plaintiff shortly after regaining consciousness, after his injury, is largely within the discretion of the trial judge.

3. CARRIERS ⬅364—INJURIES TO TRESPASSERS—LEAVING MOVING TRAINS—LIABILITY.

If, when a train reached a junction point at which plaintiff was required to change, it stopped a time reasonably sufficient for passengers to leave the train, and instead of leaving plaintiff remained on the train until it began to move, conceding him to have been a trespasser, the railroad was liable if plaintiff was required by its employés to get off while the train was moving 15 miles an hour.

4. CARRIERS ⬅381(4)—INJURIES TO PASSENGERS—LIABILITY.

Evidence held to support verdict for a passenger for personal injuries under allegations that defendant's employés threw him from the train while in motion.

5. CARRIERS ⬅381(4)—INJURIES TO PASSENGERS — LIABILITY — CONTRIBUTORY NEGLIGENCE.

Evidence held to show that a passenger suing for injuries when thrown from a train, was not guilty of contributory negligence.

Appeal from District Court, Williamson County; C. A. Wilcox, Judge.

Action by Sol Anderson against the Missouri, Kansas & Texas Railway Company of Texas. Judgment for plaintiff, and defendant appeals. Affirmed.

Wilcox, Graves & Metcalfe, of Georgetown, for appellant. J. F. Taulbee, of Georgetown, and Starnes & Taylor, of Granger, for appellee.

KEY, C. J. This is a personal injury damage suit, and as a number of objections are made to the court's charge to the jury, and as that charge discloses the nature of the suit, and as it is regarded by this court as a model, we here copy it in full, omitting certain formal parts:

"Gentlemen of the Jury: In this case the plaintiff, Sol Anderson, is suing the defendant, the Missouri, Kansas & Texas Railway Company of Texas, for damages. The plaintiff alleges that on the 16th day of October, 1914, while he was a passenger on a train operated by the defendant, in the town of Granger, Williamson county, Texas, the servants, agents, and employés of the defendant, while said train was in rapid motion, pushed, urged, and ordered the plaintiff to disembark from the car in which he was riding, which alleged act plaintiff says constituted negligence on the part of the defendant, and as a result thereof he alleged that he sustained certain injuries, on account of which he sues. For a further statement of plaintiff's allegations you are referred to plaintiff's second amended original petition, with the exception of paragraphs 5, 15, and 16 thereof, which have been abandoned. The said petition is herewith delivered to you. The defendant answered by denying the allegations of plaintiff's petition, and specially denies that if plaintiff was injured, that he was a passenger at the time he was injured, and says that upon the arrival of said train at Granger, Texas, said arrival was announced, and that the train stopped at said station for a reasonable time, and that it was plaintiff's duty, under his contract of carriage with the defendant, to disembark, from said train while the same was stopped at the station, but that plaintiff failed to do so. The defendant denies that its servants, agents, or employés pushed, ordered, advised, or compelled the plaintiff to leave said train after same was in motion, but defendant alleges that, if plaintiff left said train while same was in motion, he did so voluntarily, and was thereby guilty of contributory negligence, which contributed to cause his injury.

"You are given the following as the law applicable to this case:

"I. You are the exclusive judges of the facts proved, of the credibility of the witnesses, and of the weight to be given to the testimony; but you are bound to receive the law from the court as given you in this charge and in any special charges which may be given, and be governed thereby.

"II. The burden is upon the plaintiff to prove the allegations of his petition necessary to entitle him to recover by a preponderance of the evidence.

"III. By the term 'ordinary care,' as used in this charge, is meant that degree of care which would be exercised by a person of ordinary prudence, under the same or like circumstances.

"IV. You are further instructed that where a person purchases a railway ticket, entitling him to transportation from one point to another, and where in the course of such transportation it is necessary for such person to change from one train to another, and where upon arrival at the station where such change should be made the train upon which such person is riding is stopped for such length of time as to reasonably enable such person to make such change, and where the arrival at such station is announced, and where such passenger fails to make such change by reason of being asleep, that thereafter the railway company owes such person no duty to carry him further as a passenger, but owes to such person only the duty of exercising ordinary care to prevent injury to him; but such railway company would be liable for any injury directly resulting from any failure on the part of its servants or employés to exercise ordinary care in such regard.

"V. Now if you believe from the evidence that

on the occasion in question the plaintiff had been a passenger upon defendant's train from Houston, Texas, to Granger, Texas, his destination being Georgetown, Texas, and that plaintiff had failed to leave said train at Granger, Texas, until said train was in motion leaving Granger, and if you believe from the evidence that while said train was in motion the servants or employés of the defendant company in charge of said train pushed the plaintiff from said train, or that such employés urged or ordered the plaintiff to leave said train while the same was in motion, and if you believe that a person of ordinary care, under the same or like circumstances, would not have pushed plaintiff from said train (if said employés did do so), or would not have urged or ordered plaintiff to leave said train (if such employés did so), and if you believe that as the direct result thereof the plaintiff sustained the injuries complained of in his petition, then you will find for the plaintiff against the defendant, and assess his damages as hereinafter directed, unless you find for the defendant under other instructions hereinafter given.

"VI. Unless you find from the evidence that the employés of defendant in charge of said train pushed, urged, or ordered the plaintiff to disembark from said train while same was in motion, and that a person of ordinary care would not have pushed, urged, or ordered plaintiff to so disembark from said train, then you will find for the defendant.

"VII. If you believe from the evidence that the plaintiff voluntarily left said train while the same was in motion, and that he thereby sustained the injuries complained of, then you will find for the defendant.

"VIII. If under the foregoing instructions you find for the plaintiff, you will assess his damages at such sum as if paid to him in cash at this time will reasonably compensate him for the physical and mental pain (if any) suffered by him, and which you may believe will be suffered by him as the direct result of such injuries, and at such sum as will reasonably compensate him for his reduced capacity to earn money (if you believe his capacity in such respect has been reduced) as the direct result of said injuries, and at such reasonable sum as you may believe from the evidence has been necessarily expended by him for medical and hospital treatment as the direct result of such injuries.

"IX. If you believe from the evidence that on the occasion in question, while the train was moving out of the station at Granger, the defendant's employés ordered or directed the plaintiff to leave the said train, but said employés did not forcibly eject plaintiff from said train, and if you believe from the facts and the circumstances in evidence that it was dangerous for plaintiff to leave said train under such circumstances, and if you believe that a person of ordinary prudence, under the same or like circumstances as was plaintiff, would not have left said train, even though he had been ordered or directed by defendant's employés to leave said train, and that the plaintiff, under such circumstances, did disembark from said moving train and was thereby injured, then you will find for the defendant.        C. A. Wilcox, Judge."

Verdict and judgment were rendered for the plaintiff Anderson for $2,500, and the defendant has appealed.

As this case is unusual and novel, we copy from appellant's brief the following statement:

"There is no controversy about the fact that the appellee, Sol Anderson, was a passenger going from Houston to Granger on the north-bound passenger train of the defendant, which arrived in Granger between 2 and 3 o'clock a. m. on the morning of October 16, 1914, appellee having bought and paid for a ticket from Houston to Georgetown, and in making such trip plaintiff would have to change cars at Granger, which fact was known to plaintiff.

"It was admitted that said train was a vestibule train, and that it was the custom on that train, when it would come into Granger, to open the vestibule and let passengers out or let them in, and that an employé of the defendant stood at the vestibule, and immediately after the train would pull out of the station the vestibule would be closed.

"It is shown by the uncontradicted evidence that as' this train approached Granger on the night in question the station was announced in the cars, and also that it was the place to change cars for Georgetown, Austin, and other places, and that the vestibule was open at the front end of the chair car for the passengers to get off and on said train, and that such train remained stopped at the station at Granger for about fifteen minutes, and until all passengers who showed that they wanted to get off had gotten off.

"It is further shown that about 3.30 a. m., a short time after such passenger train had left Granger, appellee was found at a point 996 feet north of the passenger depot and on the east side of the main line track, and lying across one of the rails of the passing track, and was assisted or carried into the sandhouse of the defendant, where he remained until about 7 o'clock a. m. of the same day, and that he was then carried to Dr. Cook's office; that he was carried to Temple about 2 p. m. the same day.

"Appellee, Sol Anderson, testified as follows: " 'On the 15th day of October, 1914, the day before I got hurt, I was in camp in Brazoria county until about 12 o'clock, when I laid off and caught a train and came into Houston. When I got to Houston I went straight to the office of the Aubrey Dredging Company, I believe is the name they go by, and got my check, and then went to the Union National Bank and deposited the check, and drew out four hundred dollars, and paid off what men came into town with me. I next went up to a dry goods store with one of the boys that came in with me, who wanted to buy something. I thought the train left at 5 o'clock, and I was hurrying him up to go down to the depot with me, and the clerk in the store said the train didn't leave until 9 or 9:30, and telephoned down to see, and it didn't. I then bought some clothes, and then went around to the barber shop, and from the barber shop me and three others that worked for me had supper, and then they went down to the depot with me to say good-bye before the train left. I did not take a drink of whisky on the 15th at any time; I positively did not. I did not take a drink any time that night or the next morning up until I was hurt.'

" 'I had that ticket when I got on the train at Houston. The two holes in the ticket were punched in there by the conductor or auditor between Houston and Granger. I was not in any manner intoxicated from any cause at any time that day or that night. It was either 9 or 9:30 they said the time was for the train to leave there. I didn't look at my watch to see whether the train was on time or not. I had made the trip from Houston to Georgetown before, but it seemed like the train left Houston at 5 o'clock. I think they told me I would get to Georgetown somewhere around 3 o'clock in the morning. I got on the chair when I boarded the train at Houston. I didn't pay any attention to the car in front of the car I was in, and don't know whether it was a smoker or a chair car. I sat down in the first chair to the right as I walked into the coach, which would be one of the chairs in the northwest corner of the coach going north. I went to sleep after I got on the train that night. I did not have an overcoat that night; just had on a common coat. My recollection is I pulled my coat off

and used it for a pillow. I had a quart bottle of whisky with me, but I didn't open it. I couldn't tell you whether the bottle was one of those that is sealed over or not. I just stepped into the saloon and asked for a bottle of good whisky for medical purposes, and the man called out some brand and said, "It's a dollar and a half a quart;" and I said, "That's all right; I want the best you have got." I don't know what brand of whisky it was. I never saw it. I asked him to wrap it up in a nice package, as I didn't have a grip, and I didn't want the people to see that I had whisky. When I got into the car I set the bottle down under the seats, and I have never seen it since. I did not open it or touch it after setting it down there. I haven't any recollection of having my hands on it, and don't remember seeing it since. The last place on the road from Houston to Granger that I could be positive about recollecting is Elgin. It seems at times I could remember a good many places—Smithville and some of them—but I wouldn't be positive about that, but I do remember going through Elgin. I also remember hearing them call out Elgin. There was no one sitting in the seat next to me when we passed through Elgin. I sat down in the chair next to the wall and leaned my head over the other way. The last I can remember there were two gentlemen sitting several seats back of me, and there were some ladies and children back in the other end of the coach. I do not remember seeing anybody I knew on that coach. I just remember walking in and sitting down. I was nearly sick and had lost considerable sleep the last few nights. We had had a big rain down there, and the water was pretty well all over the country, and I was not well at all. After I left Elgin, the next time and place I could be positive about remembering was when I was in the sanitarium at Temple, but I couldn't give the date or the time. Of course, I remember when my daughter came there, but I can't remember the day or what time of day it was. The time the young fellow that was taking care of my team came is about the first thing I can remember back to, but I don't know what day it was—I never asked them what day it was. As to whether I now have or have had at any time during the last twenty months any sort of recollection of anything that happened after we left Elgin that night—if I remember right I told Dr. Thomas on the train from Granger to the sanitarium, and I think I told some of the others, that I believed, if my recollection was clear, that two men had hold of me on the train that night and I was trying to get loose from them, and my impression now is that two men had hold of me on the train that night and I was trying to get loose from them.'

"Appellee also testified on cross-examination: "'I fully knew that I was to change cars at Granger that night; I had come that same route before in coming to Georgetown. The last thing I remember real positively about is when we came through Elgin. I don't say positively that two men had hold of me or that anything of that kind occurred; that is the best of my memory, but I won't be positive about it. I do not remember when the train got to Granger, and do not remember when it came through Taylor, and I do not remember anything about how I got off that train; don't remember when the station was called or when the train stopped, and don't remember getting out of my seat and going to the door or anything else. After leaving Elgin all I remember is the hazy proposition that two men had hold of me. My memory or imagination or whatever it is I have on that does not tell me anything about who those two men were, except as to their sizes; it seems as though one was a good deal larger than the other. That memory is about like the other, though I couldn't be positive. It was while I was down in Hardin county that I first remember about the two men proposition, but I

don't remember what date that was. It was a good while after I was injured; it was here this last fall some time that that first came to me. As to whether it had been suggested to me in any way that possibly somebody had hold of me, I remember some of them asking me if I remembered being thrown off or anything, and I told them "No." I don't remember when I told anybody the first time about this vague recollection that I have of the two men having hold of me. I told Mr. Taulbee and Mr. Starnes, my attorneys, about it some time last fall when I came up here from Hardin county. It was some time after school had started, but I am not clear as to the exact time. My memory or imagination or whatever it is does not tell me whether those men were white or black; it is just a vague impression that came to me last fall some time while I was down in Hardin county. That was somewhere right about a year after the accident.'

"'After I came to at the hospital I could remember about coming to Houston from Brazoria county, and the fact of going to the bank and cashing a check and withdrawing part of it and paying my hands, and then going to the barber shop, and meeting two or three friends and being with them, and getting on the train to go to Granger, but I can't say that I remember those things immediately after becoming conscious after my injury. I remember everything I did up until I went to sleep. I remember the conductor coming around and punching my ticket, and putting the check in my hat so as not to bother me any more about my ticket, but I can't say how soon after I came to that I could remember those things. I don't know whether they came back to my mind before I left the hospital at Temple or not; I don't remember whether I thought anything about that. But I did remember them before I went back down to Hardin county. The two men proposition came to me, though, while I was down in Hardin county. Previous to that many people had asked me how I had gotten off the train, and a good many people had guessed at how I had gotten off. I suppose people in talking to me about it have asked me if I didn't fall out of a window and things of that kind, but I don't recall any certain time it was talked of or any certain person that spoke of it. I have had a good many people suggest that it might have happened this way or the other way. I have been asked a great deal about it by different people—practically all my friends that know me and know I had been hurt have asked me about it and talked to me about it. When people would talk to me about it and ask me how it occurred, I told them I didn't know, and that is all there is to it I don't know.'

"John Brown, a negro, witness for the appellee, testified that on the night of October 15, 1914, he was employed by the defendant as a lamp lighter at Granger, and on said night he had been at the north end of the yard to see about his lamps when train No. 6 went through going north, and testified further as follows:

"'If I am not mistaken, No. 6 was due to go north at that time at 2:30. That train comes from Houston. I saw that train that morning in motion going north at a point north of the passenger depot at Granger. I was going south at the time, and it was going north. I was just south of the tank as the train passed me. It was a long train. To the best of my knowledge, it was going fifteen miles an hour or even faster when it passed me. I was just walking along very slow as the train passed me. At that place it is clean open yards and switches. At that time of night I was up there for the purpose of lighting lamps. I continued in the same service a little over nine months after that. I was on the east side of the train when it passed me. As I was coming down there I was looking forward to see whom I could see, and then I saw someone fall out of the aisleway

—that is, the stepway between the two coaches—he was falling in this position (illustrates). I saw this party in between the smoker and the chair car. In the make-up of such a train there are steps which go up into the smoker and steps which go up into the chair car. I couldn't tell which end of the car it was, but it was an opening, because one man was standing on the second step· from the bottom. I don't know whether it was on the east end of the car or whether it was on the front end of the train going north or the back end of the chair car. The car has three steps; the third one makes the landing into the vestibule. As to how the man fell, I couldn't tell how he came out, but only he fell in this position (illustrates), with his hands out that way. The way the man came off I couldn't tell whether he fell from the top step or the bottom. The door was open at the place where the man fell out. Just as I saw the man fall I saw two men in the vestibule opening, one standing on the second step and one up on the platform. They were men in trainmen's clothing with their uniforms on. When the man had fallen off the train I saw the man on the second step look back. I saw something fall. There was a bottle there. The bottle fell out just after the man did. I don't know whether the bottle was pitched out by the man or how it came out, but it came out after the man did. The bottle fell right close to where the man fell. I would judge it fell about seven or eight feet from the man. The train passed on without stopping. It went on at a rapid speed. As to whether I saw anything else about that car or either one of the cars—the smoker or the chair car—except those two men, one on the step and another in the vestibule, I saw two men in the first and second window in the end of the chair car looking back and talking to each other—looking back towards that man. They had their heads out looking towards that man. When the train passed on I walked around by the man's head and I looked, but I didn't stop. I saw the man lying there, and he struggled and groaned, and I could see blood on the side of his face, and if I am not mistaken I could see blood on his left hand, but I couldn't tell whether his hand was skinned and whether it was blood from his hand or blood from his face, and he was lying kinder doubled up like. The man was lying about I suppose sixty or sixty-five feet from the end of the passing track. The man's head was nearer the east passing track than it was to the other track—the main track. The man was not making any noise except that he was groaning. I did not see the bottle lying there, I just saw it as it passed out; the bottle was back kinder behind the man. The man was out near the passing track, and the bottle fell near the main-line track. The man's head was turned towards the coal chutes and the east passing track, which would be south, and his feet were kinder angling northwest; his head southeast and his feet northwest.

" 'I am now living at Brady, in McCullough county. I am farming out there—I am renting land. I did not move out there as soon as I left Granger. I went out there myself in September, and I moved out there either on the 6th or 7th of last December, and my household goods were shipped out there from Granger, and reached there on the 25th of December. Mr. Roark was the agent at Granger at that time. I have learned that he is dead, but I do not know it personally.

" 'I came down here in a car with Mr. T. H. Anderson. Mr. Taulbee is the first man that spoke to me after Mr. Anderson, the plaintiff, received the injury, in an effort to find out something about the accident. He talked to me at Granger a short while after the injury, but I couldn't tell just when it was Mr. Taulbee spoke to me first. Neither Mr. Thad Anderson nor the plaintiff, Mr. Sol Anderson, has

ever talked to me about this case in any way.'

" 'I commenced to work for the Katy in 1912 as lamplighter. My duties were those of a motor car repairer. I usually lit my lamps twice a week; in the day we left them burning. We filled lamps twice a week, but, as my lamps had been disturbed by people robbing the oil out of them, the roadmaster made me go out every night and look after them—not to miss a night. Mr. J. H. Prewitt was the roadmaster, and he told me to do that. Sixteen of the lamps were right inside of the yard, and I would take them in every day and set them in the oil house, but the other lamps I left out there, burning night and day. Sometimes I would go and look at the lamps before midnight. It is not a fact that I would go every evening before dark to see whether the lamps were burning; I went every night after night—those were the instructions, and I did so. I did not go out at 5 o'clock to see about the lamps at this time of the year. At 5 o'clock I was off duty, to go home and get my supper and rest, and then I would go after dark and look after the lamps and see whether they were burning. I did not go at 5 o'clock, and would then be off from 5 to 6. I went home at 5 o'clock. I was off duty at 5 o'clock to go home and get my supper and rest, and then after dark I would go out and look over the whole yard to see that every lamp in that yard was burning. My instructions didn't say that I was to go out and look at the lamps along about 7 or 8 o'clock, but that I should go out after dark—good dark. I was on duty all day, but I did not work all day. I do not mean to say that I would get up in the middle of the night and go out and look at those lamps. I never would lie down and go to sleep until I had been all over the yard; some nights I was later about going out than others. On this very night I had not been asleep at all. I had worked all day, and had been awake all day; that is, I had been on duty all day, but I had not worked all day. I was off from 5 to 6 o'clock. I went home at 5 o'clock every evening. I mean to say that I was out there looking at those lamps at about 2 or 3 o'clock in the morning. I was out there then because I had failed to go earlier. The reason I didn't go out earlier was because my sisters and me and others went out walking to the cemetery late that evening after I had got off duty, and after I came back home I just laid down and went to sleep, and slept pretty late, and when I woke up I went on to my work just the same. I did not say a minute ago that I had not been asleep that night or that day; I said I had not been to sleep that day. I went to sleep after we got back from the cemetery. I had lain down after coming back from the cemetery to rest, and I slept late, and when I woke up I went out to see about my lamps. I did not go to the cemetery until after 5 o'clock, after I had gotten off duty. I was up that night at about 2:30. I expect the train didn't leave Granger that night until about 3 or a little after; the agent said it was late. I say now that I had gone to sleep and then had gotten up to look at my lamps and was coming back. I did not stop to see that man and find out whether he was hurt, although I had seen him fall off that train. I didn't stop, because I was passing—I just slowed; I didn't walk fast by him, but slowed my speed, and just looked down on him, but I didn't stop particularly— I just slowed up a little. He was lying kinder on his side and one arm and struggling and kinder moaning. I went right on by him—I didn't stop. I didn't tell anybody about it at all until Mr. Taulbee asked me about it; he was the first man that asked me any questions about it. I did not tell him about it when he asked me. I told him I was employed by the railroad company, and I was a poor man, and my job was what I was expecting to make my living out of, and I said I didn't have anything

to say. I did not tell him that I did not know anything about it. I don't know that I told him that I wouldn't talk unless he got me another job. I don't remember; I might have told him that. I finally told Mr. Taulbee about passing there and seeing this man fall off the train after I came here to Georgetown on this trip. I guess they knew before that what I was going to testify because they had a part of my testimony. I had told that man over there (Mr. Taylor) about it last February, when he was up at Brady. I think he was up at Brady in February. I had never told anybody about it up to that hour. I left Granger on the 20th of last July, and I left there at that time on a leave of absence; I was working under Mr. Farmer at that time. I was gone for a good long while. I think I wrote Mr. Prewitt a letter asking for my job back. I did not write to him in January or February. I was up there breaking my land and I didn't need any job then. I wrote to Mr. Prewitt last fall. I hadn't decided anything about telling anybody about what I knew until this man came and asked me what I knew about the case. It is a fact that Mr. Taulbee asked me that a few days after Mr. Anderson was hurt, but I don't remember Mr. Starnes or Mr. Taylor seeing me about it. The only time Mr. Taylor saw me about it was the time he came up to Brady. Mr. Taulbee has talked to me twice about it— once at Granger, when it first occurred, and the other time when I came here for this trial. When Mr. Taylor was up there at Brady he asked me what I knew about it, and I told him I was in the service of the company, and was out that night tending to my lamps, but I didn't tell him that I saw the man fall off the train or come off the train or anything else. He then asked me about where the man was lying, and I told him as near as I could, and described the grounds to him the best I could, and the best of my knowledge he asked me about my belief about it, whether I thought the man fell off the train or was pushed off or how about it; and I told him, of course, a man is liable to believe whatever he pleases, but I said I believed he was pushed off the train—that's just what I said to him. I think I told Mr. Taylor that I saw the man lying on the ground. I don't remember whether the moon was shining that night or not, but we have electric light from the coal chute that shines all over that ground, and it was right there near one of my lamps on the stand, too; that ground is all very light after night. The switch lights do throw right smart light on the ground when there are a good many of them together, and then the electric lights on the coal chute light all the station ground pretty well. I noticed that night when I was walking by there that the man's face was bloody and one of his hands was bloody. I went right on and didn't tell anybody about it. The bottle fell out after the man did, but it was just a short space between where the man fell and the bottle. The bottle was lying further north than the man. The man was lying with his head turned southeast and his feet turned to the north, and with his head towards the east passing track. I don't know what kind of a bottle it was. I didn't go to it and see what kind of a bottle it was. I couldn't tell whether it was wrapped up; all I could see was that it was a bottle as it went through the light. I couldn't tell whether the bottle was wrapped up or not, but it had a paper on it. I couldn't tell whether it was a round bottle or a flat bottle, but it appeared to be that long (indicating). It looked to be a quart bottle. I don't know whether it was a brown bottle or a clear one; I just know it was a bottle. I knew it was a bottle because I heard it hit the clinkers. I don't know whether or not the bottle broke when it hit the ground. There are lots of cinders lying about there, and I couldn't tell whether the bottle broke or not.

I didn't stop to see—I kept going. I went from there down to my oilhouse and carried my oil can inside and locked the doors and went home. As to whether or not I had been filling some lamps that night, I always take my oil can with me because my lamps had been robbed of oil. That is how they came to put me out at night, and I carried my oil can to every lamp, and after I got around to all the lamps I would bring my oil can back and put it back in the oilhouse and lock the door. As to who gave me those instructions to go out every night and see about my lamps, Mr. J. H. Prewitt himself wired a message from his office from Smithville to me when Mr. McNeil was foreman there, for me to go out and look after those lamps every night, and told me personally himself. I take care of his car there. His family live there, and that's where he lived, at Granger, and he told me himself personally to take care of those lamps—to go out every night and not to miss a single one. Mr. Prewitt was the roadmaster. Mr. McNeil was the yard foreman before Mr. Farmer went in. Mr. Farmer had been yard foreman just a short time before this accident happened. I think he was foreman at that time. We had so many new foremen until I could hardly tell who was foreman. I could hardly keep up with them; we had new ones about every week for a while.

" 'I was about fifty or sixty feet from the train when that man fell off. I was north of the man at that time. The train was on the main line, and I was walking about six or eight feet away from a pile of cinders back of the tank and near the passing track. I saw one man standing on about the second step and another man upon the platform between the cars. I could see that one of them was a white man, but the other one's face was under the shade of the car, where the door opens over this way (indicating), and I couldn't see good, but I saw his cap. The man in the shade did not look as bright as the man down on the step, because the man down on the step was looking this way in this position (illustrates). As to what kind of a looking man that was that was looking out, the train was passing pretty fast, and all I know is that he had on his train clothing, and he was a tolerably tall man; I couldn't tell whether he had a mustache or was clean shaven, the train was going too fast and me walking. This man had on a low-crowned cap.

" 'I didn't say that the electric lights threw the light directly on the place where Mr. Anderson fell. I said there was electric lights along up on top of the coal chute; those were small electric lights. It is a fact that the coal chutes are two or three or four hundred feet from where Mr. Anderson fell. I don't say that those electric lights up on the coal chutes threw a light directly where I was. I said it was tolerably light around there. I couldn't remember whether it was moonlight or not, but I say it was tolerably light, because there were some electric lights up there, and they made the ground tolerably light around there. Those electric lights on the coal chutes were the closest electric lights around there. There was a switch light up at the switch where the east passing track comes in, and there was another switch light down below him—further north from him—up where the passing track comes into the main track. I think the place where Mr. Anderson fell was about sixty feet from the point where the passing track joins the main track. The color of the light that turned south from that switch was blue. That blue light sixty feet away would not help very much down where Mr. Anderson was. I saw the blood on Mr. Anderson's hand and face. Mr. Anderson was kinder lying on his breast this way (illustrates), with his arm kinder under him. This hand was kinder up towards his face—his left hand, if I am not mistaken. He

was lying on his stomach with his left hand in this position (illustrates). I could see that his left hand was kinder skinned and had blood on it, but I couldn't tell whether it was blood from his face or not. I think it was the left side of his face that was bloody. I saw all that, but I did not stop still. Mr. Taulbee was the first man I spoke to about this, but I told him I didn't know very much about it and didn't care to have anything to say about it. I didn't tell him anything about it except that I didn't want to talk about it; that's all I said to him. And I didn't tell Mr. Taylor, when I talked to him, that I saw the man fall. Mr. Roark, the agent, never asked me a thing in the world about that accident, and neither did Mr. Prewitt, the roadmaster. Mr. Farmer, the yard foreman, didn't ask me anything about it either; he never said a word to me about it at all. I don't remember the foreman that was there who was named Smith. Mr. Prewitt's son was foreman there until Mr. Farmer took the place. Mr. Holehan, who was foreman of the yard down there and the coal chutes, and that business down there, I heard him and Mr. Roark talking to his men, telling them that they ought to have reported to him at once about the accident, but they never said a word to me and never asked me any questions. Mr. Macoughtry, the claim agent, never asked me anything about the accident. Nobody asked me anything about it except Mr. Taulbee and Mr. Taylor.

" 'Mr. Anderson was not lying on the passing track. He was lying between the passing track and the main track. I don't know whether there was a freight train in the yard right then or not. There were many freight trains and passenger trains passing through there every night, and that man was lying there injured between the tracks, and I walked right on in the middle of the east passing track, right along by his head, and went on down to my oilhouse. I knew where the sandhouse was located on that night. The sandhouse is on the west side of the main track. His body was kinder southeast from the sandhouse, but I couldn't say on which side of the sandhouse, because they have an oilhouse there, and the sandhouse is on the north end of the oilhouse, and he was lying more even with the oilhouse than he was with the sandhouse. I know where the sandhouse foreman's office was. His body was something along about the middle of that building. The oilhouse is on one end, and there is a door right in the center, and here (indicating) is his office, and the sandhouse is on this end, and he was more even with the door going into the foreman's office than he was to the sandhouse. There is a sort of hallway between the oilroom and the office, and there is a door going into the hallway, and if you go into that door and turn to the north you go into the oilhouse, and if you turn to the south you go into the foreman's office. He was lying something near even with that door, to the best of my knowledge. The east passing track at that place I think is about nine or ten feet from the main track.

" 'The man that was standing up on the platform of the car was not a very large man, but he was a tolerably tall man; the train passing in a hurry, and a fellow, unless he gets his eyes directly on the man, can't exactly describe a man's height or build, but he looked to be a tolerably heavy man—a man that would weigh somewhere between 135 and 140 pounds; he might have been a heavier man. As to which was the bigger, the man on the step or the man on the platform, I couldn't well see the man on the platform. I could just see there were two there, one standing up above the other one, but I couldn't tell which of the men was the larger. This man came off the train between the smoker and the chair car. I guess they call it the smoker; it was the car next to the colored people's car. He came out at the front end of

the chair car; it was the front end of the chair car going north. I couldn't tell which steps he came off of, whether the smoker steps or the chair car steps. As to whether it is a fact that I never did see that man come off of there at all, I will say that I did see him. I couldn't tell which steps the man standing on the steps was on, whether the steps of the smoker or the chair car. All I could tell was that it was a doorway opening. He could have been standing on the steps of the smoker and he could have been standing on the steps of the chair car. The gate was open and the man was standing on the steps, just like when it is open for passengers to go up. I know it was the second step, but I couldn't tell what car. I could see a step below the man that was standing there, and I could see that he was looking back when I first saw him. When I first saw the man standing in the doorway he was looking back. I don't know whether he was clean-shaven or had a mustache. I was about as far as from here back to the wall there north of the man when he came out of the opening.

" 'Sometimes I would go out at 7 o'clock in the morning and sometimes at 8 o'clock to bring in my lamps. Sometimes I would go on duty at 7 o'clock in the morning and sometimes at 8 o'clock. My duties during the day were to take care of those lamps—fill them and wipe them up and bring them in, clean up the globes, put in new burners, if necessary. My other duties were to take care of the motor cars that were brought in there and needed to be worked on, bill out different things that had to be sent out, clean up the yard, or just anything that would be necessary to be done there. I don't know how many times I had been out that late at night looking at my lamps. I have been out many a night later than that, because I would be off and come in and hadn't tended to my work, and I would just go ahead and look after my work before I would go home. I would be out as late as 3 o'clock in the morning sometimes. I did not make it a job to wait until nearly daylight to go out and see whether my lamps were burning, but lots of times when that train would be coming from Houston I would just be going out to look at my lamps, or I would be standing around at the depot talking to the other fellows. I didn't talk to anybody on this particular night. I saw a good many other men that night besides this man that fell off the train and the man I saw on the train. After I left my oilhouse I met a good many of them as I was going on home, and I saw that little night operator—he passed my door just as I was locking up, and he said, "Hello, John; are you just going in?" and I said, "Just going in." I don't know the name of that night operator. He is a little bit of a fellow. They call him "Pee-Wee." He is a little bit of a man. I saw him right in front of the oilhouse door. That was all he said, "Hello, John; just going in?" and I said, "Just going in." I had seen "Pee-Wee" a good many nights, but not that late. Sometimes I would be out around the depot and the office, sitting there until 2 or 3 o'clock, talking with the boys. As to when I did my sleeping, as a fellow says, "kinder between times." Sometimes I wouldn't go out until late —stay at home and never go out until 2 and 3 o'clock. I was getting forty-five dollars a month, straight time, as my pay.'

"W. L. Hyatt, a witness for appellee, testified that on October 16, 1914, he was night foreman at the roundhouse of the appellant at Granger, and that he continued in such employment until January, 1915, and that at the time of the trial he lived in Hardin county; that he did not remember about the passenger train going north on that morning, because he was asleep, but that a short time after said train was due to pass, being about 3 o'clock, and somewhere between 3 o'clock and 3:30 on that morning, he found the appellee lying on the passing track east of the

main line and opposite the sandhouse and round-house office of the defendant; that appellee was unconscious, and that he and Mr. Reasoner picked appellee up between them and carried him and put him in the sandhouse; that they laid him down on the sand, and placed something under his head, and built up a fire in the stove; that they thought he was drunk, as they smelt whisky on his breath, and did not notice any injuries on him at all, and for that reason did not notify any one of having found him; that plaintiff did not speak to them, and the only sound that he made was that he was groaning; that the next morning about 7:30 or 8 he examined the ground where he had found plaintiff, and that there were several marks in the vicinity of the place where they found the body, and that there had been some people there before he went; that there were marks in the cinders like a person had made them with his foot; that there were some small dents in the cinders, and that a further dent about three feet from where he found plaintiff's body as though made by a man's body falling in the cinders; that he found a bottle of whisky lying close to the main-line rail, with the neck broken off, but that there was still some whisky in the bottle, and that he found it within four or five feet of where he found the body; that there were other trains through the Granger yards that night, and that he did not know plaintiff, and had no idea where he came from or anything about it.

"Mrs. Bessie Anderson, witness for the appellee, testified that she was the wife of the appellee, and that she lived in Georgetown, and went to Granger on the morning of October 16th, after receiving notice that appellee was hurt, and arrived there about 9:30, and found appellee in Dr. Cook's office, and as to appellee's condition she testified as follows: 'I stayed right with Mr. Anderson from the time I found him in Dr. Cook's office at Granger until he left the sanitarium. As to when he regained consciousness, he was hurt on Friday morning at about 2 o'clock, and my daughter came to the sanitarium on Sunday, and he knew her for awhile. We would ask him if he knew Mamie, and he would say he did, and then would ask for her. My daughter's name is Mamie. Mr. Anderson was unconscious during all of the day of Friday and Friday night and Saturday and Saturday night. There were times when he would say things that would make you think he knew what he was talking about, but if you would ask him the meaning he couldn't tell you. He wouldn't know he had said anything. He remained in that condition almost a month. Of course, he got better after we got him to the sanitarium and he had been there about a week. He got so he could remember some little things we would say to him, and we could get some little things out of him, but he would forget it after he would say it.'

"Dr. E. M. Thomas, witness for appellee, testified that, at the request of appellee's wife or brother, he went to Granger on October 16, 1914, and saw appellee in Dr. Cook's office, and that about 2 o'clock p. m. he accompanied appellee to the hospital at Temple. After testifying as to the extent of the plaintiff's injuries, on cross-examination he further testified as follows: 'If a man is struck a blow on the head, or is hit in some way that produces unconsciousness, as a rule, after he regains consciousness, he will remember what happened right up to the time he received the blow. To get a concrete example, if Mr. Anderson was coming from Houston on a train, and he remembers getting on the train, and remembers riding on the train, and remembers possibly going to sleep, but does not remember how he got off, except that he waked up and walked off, he would remember getting up and walking off the train just the same as he would remember getting on the train two or three hours before, if he waked up sufficiently and was at himself all thoroughly. * * * If a man's

198 S.W.—51

memory is affected as to the happening of some events before his injury, it would not necessarily be affected in the same way as to the happening of all events before the injury. It is owing to the impression that might have been made on his mind or how strong the impression was of some of the things that transpired. He might have forgotten something, just as we all do. Taking one continuous transaction covering two or three hours, whether a man would be apt to forget part of that and remember the other, I don't know hardly how to answer that. It is like I say, though, it is owing to how much impression was made on his mind; a part of it might have been so strong as to be impressed on his mind, while the other part might not have been strong enough for him to remember it.'

"When first placed on the stand he was not asked about and did not testify in reference to a statement which had been made to him by the appellee while on the train going to the hospital at Temple, but, after the appellee and appellee's witness John Brown had testified, Dr. Thomas was again recalled and testified as follows: 'At the time I saw Mr. Anderson, the plaintiff, on the morning of October 16th, there were moments in which he would talk. He appeared to be conscious just for a moment, and would talk while I was on the train with him. At the time he talked to me on the train I thought he was conscious. He just said to me, "They put me off, but it took two of them to do it." ' 'I thought Mr. Anderson had rallied and would be all right when I got to Temple, and I told him to lie down and be quiet and stopped him from talking, and told him that he would be all right; otherwise I would have to let him go on and tell all he would, and probably would have questioned him some if I had thought that he was going to lapse back into unconsciousness. I thought he was conscious at the time. He had raised up and started to get up, and I got him to stop, and then he spoke to me—called me by my name when I went to him. He was lying in the baggage car on a cot, and I was sitting off a little ways, but I went to him when he started to get up, and he spoke to me and called my name, and it was right soon after I got to him that he said this, and I asked him to lie down and be quiet and not talk, and he did so. This occurred some time after we left Granger; I know it was after we passed Little River on the prairie there. As to how long he appeared to be conscious before he made that statement, he started to get up just when he seemed to wake up, and I went right to him and he called me by name. I wouldn't say whether I asked him anything or not—I couldn't tell about that, but I just remember him saying that, that they put him off, but it took two of them to do it. That was just about all that he said; I don't remember anything else that he did say, because I stopped him from talking. This was right after he had waked up; it was all right along together. He was lying on a cot, and started to get up, and I stopped him from that, and then he began to talk, and I stopped him from talking; and he did not give any indications at that time of suffering any physical pain that I remember. I do not think he did. His eyes were not bandaged up at that time. He opened his eyes when he roused up. As to how long he remained that way before he went into a stupor, he lay down when I told him to and got quiet, and I think he shut his eyes then, and when we got to Temple he seemed to be off again. He did not talk any more from that place on to Temple while we were on the train. My recollection is that he recognized Dr. Cook in Dr. Cook's office. They were asking if he knew so and so, and it seems to me like he said he knew Dr. Cook. He was not conscious up in Dr. Cook's office while I was there more than that, that I know of. I would say he was not conscious while he was up in Dr. Cook's office; he was not at himself

at all. This time on the train appeared to be the only time that he had a conscious interval.'

"W. H. Reasoner, witness for appellant, testified that he was employed by the appellant as engine watchman at Granger, and was so employed at the time appellant was injured; that on the morning of the injury he was in the roundhouse office, and the foreman came to the door and told him that there was a man on the track, and that he and Jess Hawkins went out with the foreman and found appellee lying across the rail of the east passing track, and that a bottle of whisky which had broken half in two was sitting against the main line rail on the west side; that it was dark, and they did not have any lantern, and that he and the witness Hyatt picked appellee up by the arms, and walked him between them to the sandhouse; and he testified further as follows: 'The man did not say anything while we were taking him to the sandhouse, and did not say anything after we got him to the sandhouse, until I asked him what his name was. He said, "But I am cold, give me some cover;" and I said, "Mister, this is a roundhouse, we ain't got no cover down here; the best I can do for you is I will build you a fire in the sand stove;" and then I built a fire in the sand stove. After that I said, "Fellow, what's your name?" and he told me some name, but I forgot what he told me; and then I said, "Where do you live?" and he said, "Georgetown." When we found him out there I did not know that he was injured in any way and did not see any injuries on him; I thought he was drunk.' The witness further testified that he did not know who the appellee was and did not know how he got there; that his duties as engine watchman was in cleaning fires and doing work on the engine and sanding them up; that he knew John Brown, the negro lamplighter, but did not see him anywhere in the yards that night; that witness' duties took him to different places in the yards, and that he worked anywhere in the yards where the engines were; that he had seen John Brown in the yards after night going up and down the main line, but he had never seen him in the yards after midnight. This witness testified further that he stayed in the sandhouse only a few minutes with the appellee, and did not see him again until the next morning, and that the sandhouse was not cold after the fire was made.

"Dr. D. M. Cook, witness for appellant, testified, as follows: 'I remember the occasion that Sol Anderson, the plaintiff in this case, received an injury of some kind at Granger. I first saw him out in front of the passenger station on a cot, and from there he was carried to my office at about 7:30 or 8 o'clock in the morning, according to my best recollection. I remained there from about 8 o'clock in the morning until passenger train No. 10 went north, which was about 2 or 2:30 in the afternoon. I was with him most of the time while he was in my office. I was out two or three different times, and at noon I was out. I think possibly I went and made one little call out in town while he was there in my office, but I did not leave the office until after Dr. Thomas, of Georgetown, came over, except that I might have walked down stairs for a few minutes for something, but I was in the office most of the time. I dressed Mr. Anderson's wounds. He had a cut over his left eye, and a bruise on his right cheek, and a bruised place on his right side, and if I recollect right possibly a little bruise on his head, and the third metacarpal bone of the third finger of his right hand was broken and protruding through the skin. I am not positive as to whether the second was or not, but I know positively that the third was broken and protruding through the skin—a compound comminuted fracture. Since reflecting about it, it was the third and possibly the next finger of

which the bones were broken. In dressing his wound, I merely put on a temporary dressing. Mr. Anderson seemed to be in a semiconscious condition; I could not get much statement out of him. I asked him a few questions—asked about who he was and if he knew me, and where he was from, and I think Mr. Starnes—although I would not be positive about this—asked him if he knew Dr. Cook—"Don't you know Dave Cook?" And he glanced up and said, "Yes, I do; I believe I do." I was personally acquainted with Mr. Anderson, but I did not know who it was until after I was told. I used to know Sol Anderson, but it has been a good while since I saw him. After I found out who he was, of course I recognized him. Whatever statements he might have made were made in response to questions that were asked him. I asked him some questions and Mr. Starnes asked him some questions, two or three possibly. Mr. Walker and several others were in the office there, but I can't recall from memory who it was. I know I asked him several questions. I said, "Sol, don't you know me?" and if my memory serves me, Mr. Starnes said, "Don't you know Dr. Cook? Don't you know Mr. Dave Cook?" And he said, "Yes; I believe I do." He did not say anything in response to any question asked him about how he received the injury or how he got off that train. We never could get anything out of him in regard to how he got off the train or where he got off or anything about it. I asked him if he recollected when he got to Granger or recollected coming to Granger, and he said, "I think I was asleep, and it seems to me somebody told me to get off, and that is all I recollect." That is all the statement he ever made from which I could gather anything. When we first took him to the office there were several others there, but a good part of the time I was by myself, and I know we were trying to get out of him whether or not he wanted to go home. Some one went and telephoned to his wife, or I told them to go and telephone to his wife, and his folks came over. I don't know just what time they came, but it was somewhere about 10:30 or 11 o'clock. He did not say anything about who told him to get off the train. At the time he was doing this talking it seemed as though he was partly conscious at times; it was just intermittent. At times he would be conscious for a short time, and I would question him to see if I could find out anything, and he would be conscious for a few words and pass then into a semi-comatose condition. That was maybe an hour after we got him into the office, and he seemed to brighten up a little while after we got him in there and got him on the table or on the cot— I have forgotten which we had him on—but he seemed to brighten up some and would answer us like he knew some things, but he was mostly mumbling words just as though he was dazed.'

"J. H. Prewitt, witness for appellant, testified that he was roadmaster for appellant; that he knew John Brown, who was formerly a lamplighter at Granger; that Brown would go on duty at 7 o'clock in the morning and take up lamps from the switches and clean them and work around the station, etc., until he would put the lamps out again in the afternoon; that when he first went to work he worked until 6 in the afternoon, but that after that time witness instructed the yard foreman to lay Brown off at 5 o'clock and give him one hour's rest, and then he would be on duty from 6 to 7; that witness had never instructed Brown to go over the yards at any later hour than that with the exception of one or two occasions between 7 and 8 o'clock in the evening he had sent him out to light some certain lamp; that witness had never sent a telegram to go out late at night and look after the lamps; that witness had come into Granger late at night on his motor car, and

had come in on all trains, at all times of the night, and that he had never seen the witness Brown in the yards after midnight.

"E. L. Farmer, witness for appellant, testified that he was yard foreman for the appellant at the time plaintiff was injured; that he knew the witness John Brown, and that such witness Brown got his instructions from this witness, and that he had never given Brown any instructions to go over the yards after midnight, and that Brown was on duty from 7 in the morning until 6 in the afternoon, but that was not on duty from 6 in the afternoon until 7 in the morning.

"A. G. Hastings, witness for appellant, testified that he was a telegraph operator for the appellant during October, 1914; that he was better known as 'Pee-Wee'; that his hours for working were from 2 in the afternoon until 11 at night; that he knew the lamplighter, John Brown; that he did not remember seeing Brown on the morning that appellant was hurt, and did not remember ever having seen Brown in the yards after 12 o'clock at night during that fall; and that he did not meet Brown and ask him if he was just turning in.

"W. A. Smith witness for appellant, testified that he was conductor in charge of the train in question, and that the train arrived in Granger about 3 a. m.; that the station was announced, vestibule opened, and that the train stopped about 15 minutes at the passenger station, and stayed there until all passengers who showed that they wanted to get off had done so; that he did not know appellee, and did not know that appellee had been injured until his return trip in the afternoon, when he was informed by the agent at Granger of such fact; that he did not know how appellee was injured or how he got where he was found; that no one was put off his train as it left the station and was in motion so far as he knew, and if a man had been put off between the chair car and smoker, or if there had been any scuffle, he would have seen it; that his crew consisted of himself, brakeman, Cole, porter, Jim Allen, and auditor, Bridges; that Bridges he understood is dead; that he would not have permitted any passenger to get off the train after it was in motion if he could have helped it; that there were no vestibules or platforms left open on the train that night that he knew of.

"C. C. Cole, witness for appellant, testified that he was brakeman for appellant on the train in question, and that the first he heard of any one having been injured was on his return trip in the afternoon of the same day when he got back to Granger; that on the morning in question he called the station as they were entering the yard limits at Granger, and called the changes of Georgetown, Austin, etc.; that he then opened the vestibule and stood at the opening until passengers had gotten on and off the train, and then, when the train left, he got back on and closed the vestibule and trap; that the vestibule open was at the north end of the chair car and the south end of the smoker; that there were some Pullman sleepers on the train, but that he had nothing to do with that part of the train, and did not know whether any openings had been made in the Pullmans or not; that he did not remember ever having seen appellee until the trial, and did not remember having seen him on the train; that he knew where the roundhouse office and sandhouse are located, and that no one got off at the opening he had made as the train passed that place, and if any one had gotten off he would have known it; that he did not put any one off nor assist in putting any one off after the train got in motion, and if any other member of the crew had put any one off at the north end of the chair car he would have known it; that in opening the vestibule the floor trap is opened first, and then the outside door opens back against that; that there is a latch on the floor that you put your finger in and pull

up in order to release the floor trap, and then there is a spring that pulls the trap back against the end of the car; that almost anybody can open the trap by taking hold of the latch; that he did not remember any one opening the trap at the rear of the chair car on that night, and does not remember having found any opening open; that he would not have permitted any passenger to get off after the train had gotten in motion; that when the train passed the roundhouse office and sandhouse it was going 15 or 18 miles an hour, and that it would have been dangerous for any one to have gotten off said train at such speed.

"Jim Allen, negro, witness for appellant, testified that he was porter on the train in question; that the station was called before they got to Granger, when the whistle blew for the station; that he did not hear of appellee having been injured until some four or five days afterwards; that no one was put off of the train after it got in motion; that he knew where the roundhouse and sandhouse were located, and if a man had been put off the front end of the chair car he would have known it.

"P. B. Macoughtry, witness for appellant, testified that train auditor Bridges died in July, 1915."

## Opinion.

[1] The first three assignments complain of the action of the trial court in overruling objections to that portion of the testimony of Dr. Thomas wherein he stated the plaintiff said they put him off, but it took two of them to do so. We have reached the conclusion that the statement referred to, though made about 11 hours after the injury was inflicted, constituted part of the res gestæ, and was admissible as such. Freeman v. State, 40 Tex. Cr. R. 545, 46 S. W. 641, 51 S. W. 230; Lewis v. State, 29 Tex. App. 201, 15 S. W. 642, 25 Am. St. Rep. 720; M., K. & T. v. Moore, 24 Tex. Civ. App. 489, 59 S. W. 282; Craig v. State, 30 Tex. App. 619, 18 S. W. 297; P. & G. N. Ry. v. Calvin, 103 S. W. 429. When a person is rendered unconscious by an injury, and as soon as consciousness is restored makes a statement as to how the injury occurred, such statement possesses as much spontaneity, and is regared as much a part of the transaction which resulted in the injury, as if it had been made at the time or immediately thereafter, and for that reason such statements are admitted in evidence as part of the res gestæ. The testimony of Dr. Thomas tends to show that appellee was conscious when he made the statement, and the evidence of his condition prior to that time does not indicate a frame of mind capable of formulating a self-serving declaration, and tends to exclude the idea that the statement was the result of premeditation or design. In the Moore Case, just referred to, the statements held to be admissible were made after a lapse of about 12 hours.

[2] According to the rulings of the Court of Criminal Appeals in the Freeman Case, the admissibility of such testimony rests largely in the discretion of the trial judge, and we are not prepared to declare the law otherwise; and in this case we do not think that discretion was abused.

Several objections are urged against the

court's charge and to the refusal of requested instructions, all of which have been considered and are overruled. Without unnecessary elaboration, the learned trial judge submitted the case to the jury in a charge which stated the law of the case clearly, fairly, and correctly. Appellant's requested charge upon the subject of contributory negligence, if given, would have told the jury that the burden of proof upon that subject rests upon appellant, unless contributory negligence was shown by the testimony submitted by appellee. The court gave no charge upon the burden of proof as to that issue, and placed no restriction upon the jury in considering all the testimony—that adduced by appellee as well as appellant. The course pursued by the trial court in that respect is the course that was recommended by our Supreme Court in Stooksbury v. Swan, 85 Tex. 563, 22 S. W. 963.

[3] As to appellant's contention that if, when the train reached Granger, that station was announced, and the train stopped a time reasonably sufficient for passengers to disembark, and the plaintiff instead of doing so remained upon the train until after it left the station, he was a trespasser, and the defendant owed him no duty, other than to refrain from willfully, knowingly, or wantonly inflicting injury upon him, we have reached the conclusion that it is immaterial whether that contention is correct, or whether under such circumstances the plaintiff was a licensee. If the plaintiff was ejected from the train, or required by appellant's employés to get off at the time and under the circumstances disclosed by the undisputed testimony, appellant is liable, even if it be conceded (which, however, we do not hold) that the plaintiff's status was that of a trespasser. The rule upon that subject is stated as follows:

"In general it is negligence to expel a person from a train or car in motion, and the carrier will be liable for the injury resulting therefrom due to the act of a servant within the scope of his employment. In some cases, however, it is said to be a question for the jury whether, under the circumstances, such expulsion is negligent.

"The servants of the carrier should not expel a passenger (or even a trespasser) at a time or place which is dangerous, and the carrier will be liable in such a case not only for injuries directly suffered in connection with such expulsion, but also for subsequent injuries proximately due thereto, such as injury from other trains which the ejected person could not reasonably avoid, the probable consequences of improper exposure, and the like." (6 Cyc. 562, 563.)

[4] It is contended on behalf of appellant that the verdict and judgment are not supported by satisfactory and sufficient testimony. We have carefully considered that question, and have reached the conclusion that while the case is unusual, anomalous, and resting largely upon circumstantial evidence, still, if the jury believed all the testimony given by the plaintiff's witnesses, it cannot be said that the verdict is unsupported by evidence. If the witness Brown told the truth (which was for the jury to decide), the plaintiff was ejected or fell from the train when it was moving at the rate of 15 miles an hour, and that he sustained serious injury is not disputed by appellant. Also, if that witness told the truth, it is highly probable that two of appellant's employés caused the plaintiff to fall from the train as he did, and whether they accomplished that result by the use of actual force, or by oral command or persuasion, is not material. The testimony of the witness Brown is corroborated by the evidence of Dr. Thomas as to the statement made by the plaintiff; and while the plaintiff's testimony, taken as a whole, may not be entirely satisfactory to some minds, still we are not prepared to say that it does not support the finding of the jury to the effect that appellant's employés wrongfully and negligently caused him to fall from or get off the moving train, as contended by his counsel. Therefore we overrule the assignments which complain of the verdict, and hold that it is sustained by the testimony.

No complaint is made as to the amount of damages awarded, and therefore we deem it unnecessary to make any finding upon that subject.

[5] The verdict involved a finding that the plaintiff was not guilty of contributory negligence, and the testimony supports that finding.

Some other questions are presented in appellant's brief, which we deem unnecessary to discuss in this opinion. They have all been considered, and are decided against appellant.

No error has been shown, and the judgment is affirmed.

Affirmed.