Kent Anthony GRAHAM, Appellant,

v.

The STATE of Texas, Appellee.

No. 68820.

Court of Criminal Appeals of Texas, En Banc.

Oct. 21, 1981.

On Rehearing Jan. 18, 1983.

Cornell Walker and Paul Banner, court appointed, Greenville, for appellant.

F. Duncan Thomas, Dist. Atty. and Steven Watkins, Asst. Dist. Atty., Greenville, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

This is an appeal from a conviction for capital murder. At the punishment phase of the trial, the jury answered the issues under Art. 37.071, V.A.C.C.P. affirmatively and the death penalty was assessed.

Appellant raises twenty-one grounds of error on appeal. In light of *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), however, our initial and primary attention focuses on one of the contentions that several prospective jurors were improperly excused over objection under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) in that V.T.C.A., Penal Code Sec. 12.31(b), was broadly applied in contravention of the Sixth and Fourteenth Amendments.

In *Adams v. Texas,* supra, the United States Supreme Court clarified the permissible grounds for challenging venire members by holding that the Witherspoon doctrine is violated by excusing a potential juror who could follow the court's instructions in the charge but who could not take the Section 12.31(b) oath to remain unaffected by the potential death penalty. It appears from the following portions of the voir dire examination of venire member Slack that the trial court excluded a juror under Sec. 12.31(b), supra, who would not have been excludable under Witherspoon:

"Q. All right sir. How do you feel generally about capital punishment?

"A. Oh, I think capital punishment is justified under certain conditions.

\* \* \* \* \* \*

"Q. ... the question I need to ask you is would the fact that the penalty for

capital murder is automatically life or death affect your deliberations on any particular fact issue in the case?

"A. I, I imagine so.

\* \* \* \* \* \*

"Q. And you can conceive then, sir, of some case—not this case; not a particular fact circumstance—but of some case in which the death penalty could and should be imposed? Maybe not should be but could be imposed?

"A. ... [Y]es, I think that the death penalty is, is a fitting thing in some instances, that society has that right.

"Q. And you can think of some set of circumstances in which you yourself, if—first of all guilt was established beyond a reasonable doubt and if you were convinced if that was necessary, can you think of some instance in which you yourself could impose, vote to impose the death penalty?

"A. I suspect I probably could."

Direct examination was resumed and after the following interchange, Slack was excused:

"Q. But, Reverend Slack, the statutory question that I need to ask you is would the mandatory penalty of either life or death affect your deliberations on any particular fact issue? Would that—in other words, would that be a consideration that you would give in your deliberations, thinking about the automatic nature of the penalty, because it's pretty high, either life imprisonment or death. That's what I'd like to know.

"A. Well, I'm tempted to say—I suspect it would. I don't see how it could keep from making some difference.

"Q. All right, sir.

"THE COURT: Would it or would it not, Brother Slack?

"THE JUROR: It would.

"THE COURT: Affect your deliberations? As to facts in the case. Is that right?

"THE JUROR: Yes, it would.

"MR. DAVIS: We would reurge our earlier statement to the court, Your Honor.

"THE COURT: I'm going to excuse the juror.

"MR. WALKER: Note our exception, Your Honor."

In *Adams* the Supreme Court noted that although the State could, consistent with *Witherspoon,* use Sec. 12.31(b) to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths, the use of Sec. 12.31(b) to exclude such prospective jurors on broader grounds based on their opinion concerning the death penalty is impermissible. The court stated that it is improper to exclude jurors who stated that they would be "affected" by the possibility of the death penalty, "but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally."

As in *Adams,* it does not appear that prospective juror Slack was so irrevocably opposed to capital punishment as to frustrate the State's legitimate efforts to administer its constitutionally valid death penalty scheme. Indeed, the voir dire examination reflects that he considered the death penalty proper in some cases and probably could vote to impose the death penalty. Additionally, he indicated he could make a determination of guilt or innocence based solely on the evidence presented at trial. Although the precise statutory question was answered negatively, Sec. 12.31(b) may not be applied by the trial court to exclude a prospective juror whose only fault is to acknowledge honestly that he has conscientious reservations against capital punishment and that the mandatory penalty of death or imprisonment for life might affect his deliberations. *Durrough v. State,* 620 S.W.2d 134 (Tex.Cr. App.1981); *Evans v. State,* 614 S.W.2d 414 (Tex.Cr.App.1980); *Loudres v. State,* 614 S.W.2d 407 (Tex.Cr.App.1980). Therefore, the application of Sec. 12.31(b) that is required by *Adams* and *Witherspoon* calls for a determination of not merely whether the mandatory penalty would "affect" his delib-

erations, but rather the *extent* to which the juror would be affected.[1]

■ The death penalty may not be imposed if even one prospective juror has been excluded in violation of *Witherspoon, Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976), and the judgment of guilt must be reversed. *Evans,* supra. We will not reform the verdict reached at the punishment stage by an improperly selected jury in such a way as to render judgment of life imprisonment. *Fearance v. State,* 620 S.W.2d 577 (Tex.Cr.App.1980); *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App.1980); *Loudres,* supra; *Pierson v. State,* 614 S.W.2d 102 (Tex.Cr.App.1980).

■ Because of our disposition of the Adams question, the only remaining issue that we need address is appellant's twenty-first ground of error wherein the sufficiency of the evidence is challenged. The significance of the contention is that if sustained, a retrial would be barred. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). Therefore, a challenge to the sufficiency of the evidence should be considered before disposing of a case even though reversal may be based on another ground. *Hooker v. State,* 621 S.W.2d 597 (Tex.Cr.App.1980); *Watson v. State,* 605 S.W.2d 877 (Tex.Cr.App. 1979) (opinion on original submission); *Swabado v. State,* 597 S.W.2d 361 (Tex.Cr. App.1980).

■ Appellant argues that the trial court erred in admitting hearsay statements of the murder victim as related to a police officer and that if such testimony is properly excluded, the remainder of the record does not sufficiently show his connection with the death of the victim, Linda Mae Rogers, to corroborate the accomplice witness in order to sustain a conviction. However, the record shows that the statement of the accomplice witness was sufficiently corroborated by other admissible evidence "tending to connect" appellant to the murder and therefore the hearsay objections need not be addressed. *Infante v. State,* 612 S.W.2d 603 (Tex.Cr.App.1981); *Carrillo v. State,* 591 S.W.2d 876 (Tex.Cr.App.1979); *Deas v. State,* 531 S.W.2d 810 (Tex.Cr.App. 1976); *Runkle v. State,* 484 S.W.2d 912 (Tex.Cr.App.1972).

The record reflects that appellant's brother, Jeffrey Scot Graham, made a voluntary statement in which he related that after some discussion, he and appellant decided to commit a robbery at a Fisca service station. They left their house in a dark brown Firebird with a beige vinyl top at approximately eight o'clock on the evening of April 9th. Upon their arrival at the station, the attendant filled the car with gas and checked the oil. After following the girl into the station to get the oil, appellant began shooting her. He returned to the car, closed the hood and reached into the car for additional bullets. Appellant then instructed his brother to drive around the block and as he subsequently circled the car back toward the station, appellant was walking toward the car. He got in the car and they headed home. Appellant told his brother he had shot the woman.

■ To test the sufficiency of the corroborative evidence, the accomplice's testimony is eliminated from consideration and the evidence of the other witnesses is examined to ascertain if there is any inculpatory evidence which tends to connect the accused with the commission of the offense. *Walker v. State,* 615 S.W.2d 728 (Tex.Cr.App. 1981); *Infante,* supra. The testimony of several witnesses tends to place appellant at

1. As stated by the Supreme Court in *Witherspoon:*

"... the most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out *even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion.* 391 U.S. 510, 522, n. 21, 88 S.Ct. 1770, 1777, n. 21, 20 L.Ed.2d 776 (Emphasis added.)"

the scene of the offense at the time of its occurrence. Witness Woodard testified that she was at the Fisca station visiting with her sister, the victim, at approximately 8:55 p.m. No one else was there at the time and as she was leaving, she noticed a brown Firebird pull into the station. She recognized Jeffrey Graham and also "got a good look" at the passenger whom she identified as appellant at trial. Witness Rudd testified that she was at the Fisca station at about 9:00 p.m. and that upon leaving she noticed a brown Firebird with a tan top pulling into the station. No other cars were in the area at the time. Witness Hansford testified that she pulled up to the Fisca station at about 8:55 and saw the attendant fall off the chair in the office. Noticing red stains on the victim's shirt, she started toward a nearby grocery store to call the police. She noticed a man walking around toward the back of the building. Although her view was from behind, she testified that the appellant looked like the man she saw walking around the station at the time the victim's body was discovered.

The cumulative weight of the evidence tends to connect appellant with the crime. Proof that an accused was at or near the scene of a crime at or near the time of its commission may tend to connect the accused with the crime so as to furnish sufficient corroboration to support a conviction. *Deas v. State,* 531 S.W.2d 810 (Tex.Cr.App. 1976). The testimony of several witnesses places appellant at the scene at the time of the commission of the offense.

We hold the evidence to be sufficient to sustain the conviction. The conviction is reversed because of the improper exclusion of a prospective juror under Sec. 12.31(b) and *Witherspoon,* and the cause is remanded.

ONION, P.J., concurs.

### OPINION ON STATE'S MOTION FOR REHEARING

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. After finding appellant guilty, the jury answered "yes" to the three special issues submitted under Art. 37.-071(b), V.A.C.C.P. Punishment was assessed at death.

On original submission, appellant's conviction was reversed due to the improper exclusion of a prospective juror under V.T. C.A., Penal Code, Sec. 12.31(b) and *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In its motion for rehearing, the State "requests this Court to grant it the option of accepting a life sentence in this case." Such requests have previously been denied by this Court. See *Fearance v. State,* 620 S.W.2d 577 (Tex.Cr. App.1980); *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App.1980); *Loudres v. State,* 614 S.W.2d 407 (Tex.Cr.App.1980). However, the record in the present cause reflects that on January 7, 1982, the Honorable William P. Clements, Jr., Governor of the State of Texas, signed a proclamation commuting appellant's punishment to life. In view of appellant's life sentence following the commutation, errors, if any, in the punishment phase of this prosecution are harmless. See *Sanne v. State,* 609 S.W.2d 762 (Tex.Cr.App.1980). However, as hereinafter noted, we still have the responsibility of reviewing alleged errors at the guilt stage of the trial.

In *Whan v. State,* 485 S.W.2d 275 (Tex. Cr.App.1972) we held under Art. 4, Sec. 11, of the Texas Constitution providing "the Governor shall have power, *after conviction* ... to grant reprieves and commutation" (emphasis supplied) that the Governor may commute a death sentence to life imprisonment before the final disposition by this Court. See also *Rodriguez v. State,* 626 S.W.2d 35 (Tex.Cr.App.1981); *Wilder v. State,* 623 S.W.2d 650 (Tex.Cr.App.1981); *Simmons v. State,* 623 S.W.2d 416 (Tex.Cr. App.1981); *Adams v. State,* 624 S.W.2d 568 (Tex.Cr.App.1981); *Clark v. State,* 627 S.W.2d 693 (Tex.Cr.App.1981).

In each of the foregoing capital murder cases, at the time the commutation proclamation was issued, the alleged error before the Court affected only the punishment stage of the cases. Since the Governor's commutation "rendered the death penalty

portion of the trial court's judgment and subsequent sentence a nullity," *Whan,* supra at 277, and mitigated the punishment in the cases to the only other possible punishment which could have been entered upon a guilty verdict in a capital case, V.T.C.A. Penal Code, Sec. 12.31, we affirmed the judgment of conviction in each of those cases.

However, we noted in *Whan,* that "a commutation does not affect the judgment, but merely mitigates the punishment which can be given." 485 S.W.2d at 277. When, as in the instant case, there is error in the guilt stage which affects the judgment, the commutation by the Governor, which relates to punishment only, is of no effect.

In his ninth ground of error, appellant contends the court erred in admitting hearsay evidence.[1] Such evidence consists of the victim's out-of-court declaration to a police officer that appellant was the individual who shot her.

The instant offense occurred at the Fisca Service Station in Greenville on April 9, 1979. Peggy Woodard testified that she was at the station on the day of the offense visiting with her sister, the victim. Woodard left the station at approximately 8:55 p.m. and related that no one was there other than her sister. Officer Raymond Webb, of the Greenville Police Department, arrived at the service station at 9:18 p.m. Upon entering the station, he found the victim lying on the floor. Rogers was conscious and told Webb that she had been shot six times in the back. Rogers was then taken by ambulance to Citizen's General Hospital in Greenville.

Dr. Harris Hollingsworth testified that he performed surgery on Rogers on the night of April 9. Hollingsworth removed two slugs from Rogers and she was then placed in the intensive care unit. Hollingsworth related that on April 23, Rogers "was stable" in her condition. She was then transferred to a "regular room." She suffered "brain death" on April 25.

The evidence of which appellant complains in this ground of error was admitted through the testimony of police officer Ivan Gustin, of the Greenville Police Department. Gustin testified that at 8:50 a.m. on April 10, he went to the hospital in order to see Rogers. The officer took six photographs with him. Gustin testified that Rogers was unable to speak, however she was able to move her lips and make gestures with her hands.

Gustin related that upon entering Rogers' hospital room he "asked her if she would look at some pictures and try to identify someone who had robbed her." One of the photographs depicted appellant. Gustin testified that he asked Rogers "who shot you?" In describing Rogers' actions when she was shown appellant's picture, Gustin testified that "she made a shooting motion with her hands." Specifically, Gustin stated:

"A. (By the witness) She made a shooting motion, cocking her thumb with her finger pointed out.

"Q. (By Mr. Davis) Was this a very definite gesture?

"A. Yes, sir, it was."

The court overruled appellant's numerous and timely objections in which it was urged that Gustin's testimony describing Rogers' actions constituted inadmissible hearsay.

In *Salas v. State,* 403 S.W.2d 440 (Tex.Cr. App.1966), it was stated that hearsay evidence is that which a given witness offers in court which is not based on his own knowledge but is merely a repetition of what he has been told and which is offered as proof of truth of matter contained therein. This Court has recognized that an assertion by conduct can be hearsay. In *Byrd v. State,* 89 Tex.Cr.R. 371, 231 S.W. 399 (1921), it was noted that evidence from a witness to the effect that he was present when a third party pointed out the defendant as the man who sold him liquor, would be objectionable as hearsay. In this regard, in 1A R. Ray, Texas Evidence, 3rd ed., Sec.

---

1. In light of our disposition on original submission it was not necessary to consider this ground of error.

784, pp. 7–8, it is recognized that an assertion by conduct which indicates a belief of some alleged fact is hearsay. Specifically, it is written:

"A sharp contrast is drawn between evidence of *statements* or *assertions* made by one out of court which is a characteristic feature of hearsay evidence, and evidence of *acts* or *conduct* of persons out of court which of course is generally objectionable on this score. But suppose the evidence of the act is only significant as indicating a *belief* on the actor's part of some alleged fact. Suppose the issue to be whether A was the man who committed a theft from B, and to show B's belief evidence is offered that B assaulted A immediately after the theft. If the evidence has any relevance, it is only as the equivalent of a statement by B that A was the thief. Of course, B's conduct would not be understood as being a manner of communicating his belief; an assault is not normally 'a substitute for words in expressing the matter stated.' If he were asked, Who is the thief?, and pointed to A, his action would be 'assertive,' and subject to the hearsay objection as fully as the statement, 'A is the thief.' Sign-language, and an expressive gesture, are the substantial equivalent of verbal statements." (Emphasis in original).

In *Wells v. State,* 43 Tex.Cr.R. 451, 67 S.W. 1020 (1902), the defendant's conviction for rape was reversed due to the improper admission of hearsay. There, two witnesses were permitted to testify that the husband of the prosecutrix assaulted the defendant shortly after the rape. Such evidence was inadmissible, as hearsay, as tending to show that the husband beleived that the defendant was the man who had committed the offense.

In *D.L.N. v. State,* 590 S.W.2d 820 (Tex. Civ.App.—Dallas 1979, no writ), the defendant's conviction for sexual abuse of a child was reversed due to the improper admission of hearsay testimony. In describing such testimony, the court stated as follows:

"The girl's father also testified concerning the meeting. He said that the child was present and that he and others asked her questions. At this point appellant's hearsay objection was overruled. The father then testified that he asked the child to demonstrate what had happened, and she responded by pulling up her dress and saying 'He kissed me right there.' When asked what he made her do, she went over to appellant, put her head in his lap and tried to undo his pants. After this testimony was given, appellant's counsel objected that the scene 'took place somewhere else,' that the child was forced to do something by her father, that nobody was under oath, and took place outside the courtroom, and asked the court to instruct the jury to disregard the evidence. These objections were overruled." Id. at 822.

The court concluded that none of the foregoing evidence was competent to prove the delinquent conduct alleged, since all of it depended on assertions by the child and conduct by her that was interpreted by her parents and others as indicating what had occurred between her and the defendant. It was thus concluded that such evidence was hearsay and not admissible within any exception to the hearsay rule.

■ In the present cause, Gustin testified that he showed several photographs to the victim after asking her to identify the individual who had shot and robbed her. When shown appellant's photograph, Rogers made a shooting motion with her hand. Gustin's testimony concerning Rogers' actions and conduct was only significant as indicating her belief that appellant was the individual who had shot her. Such conduct was assertive in nature and testimony concerning that conduct was hearsay.

■ The State concedes that Gustin's testimony concerning Rogers' conduct constituted hearsay. However, the State maintains that such testimony was admissible "as part of the victim's res gestae."

In *Watson v. State,* 532 S.W.2d 619 (Tex. Cr.App.1976), this Court noted that we have previously held that a description of the offender given by the victim of the crime to police officers *immediately* after a crime is

admissible as a res gestae statement. In *Ricondo v. State*, 475 S.W.2d 793 (Tex.Cr. App.1971), it was found that a statement made shortly after the victim was beaten was admissible as a res gestae statement.

In *Martinez v. State*, 533 S.W.2d 20 (Tex. Cr.App.1976), the defendant sought to introduce certain statements made by the victim before his death. The statements allegedly identified someone other than the defendant as the person who had committed the offense. The trial court refused to admit the statements. This Court concluded that the statements were properly excluded. It was noted that the statements were made 18 hours after the victim had been stabbed and had an opportunity to talk with other persons. It was held that under the circumstances presented, the spontaneity of the statement and the absence of time to contrive, misrepresent and fabricate were not sufficiently shown to justify overruling the trial court's decision to exclude the testimony.

In the present cause, Rogers was shown appellant's picture some 12 hours after the offense. The victim had been through surgery and was confined in the intensive care unit. The State did not present evidence of Rogers' physical condition or state of mind at the time she spoke with Gustin. Under the circumstances presented, we are unable to conclude that Rogers's conduct was shown to be spontaneous and unreflective in nature. Therefore, Gustin's testimony concerning Rogers' conduct was not admissible as a res gestae statement or action of the victim.

Further, Gustin's testimony concerning Rogers' conduct was not admissible as a dying declaration. Art. 38.20, V.A.C. C.P., provides for the admissibility of a dying declaration in the following manner:

"The dying declaration of a deceased person may be offered in evidence, either for or against a defendant charged with the homicide of such deceased person, under the restrictions hereafter provided. To render the declarations of the deceased competent evidence, it must be satisfactorily proved:

"1. That at the time of making such declaration he was conscious of approaching death, and believed there was no hope of recovery;

"2. That such declaration was voluntarily made, and not through the persuasion of any person;

"3. That such declaration was not made in answer to interrogatories calculated to lead the deceased to make any particular statement; and

"4. That he was of sane mind at the time of making the declaration."

Rogers' conduct does not qualify as a dying declaration under the provisions of the above quoted statute because the evidence does not show that she was conscious of approaching death and believed there was no hope for recovery at the time she identified appellant's picture as the person who had robbed and shot her. See *Martinez v. State*, supra.

We find the court erred in overruling appellant's objection to Gustin's testimony concerning Rogers' conduct at the photo spread. Whether the improper admission of hearsay evidence requires the reversal of a conviction is determined on a case by case basis. *Torres v. State*, 552 S.W.2d 821 (Tex.Cr.App.1977). The duty of this Court is to determine from the record the probable impact of the erroneously admitted evidence upon "the minds of the average jury." *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). Unless there is a reasonable possibility that the improperly admitted evidence contributed to the defendant's conviction, reversal is not required. *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979).

The only direct evidence of appellant's participation in the instant offense, other than Gustin's testimony concerning Rogers' conduct, came from the testimony of appellant's codefendant and brother, Jeffrey Graham. He related that in return for his testimony in the instant cause, a plea bargain agreement had been reached in which capital murder charges would be dismissed and he would plead guilty for a five

year sentence to a charge of conspiracy to commit capital murder. Graham related that he and his brother, appellant, went to the scene of the offense. While Graham stayed in his automobile, appellant entered the service station and "started shooting." Graham did not see his brother shoot the attendant. However, when appellant returned to the car, he told Graham that he had "shot the woman." Finally, Graham related that he had driven his car, a brown Firebird, both to and from the scene of the offense.

Officer Raymond Webb testified that he arrived at the scene of the offense at approximately 9:18 p.m. He found the victim on the floor lying on her back. She told Webb that the person who shot her "was driving a brown Firebird." The victim's sister, Woodard, was at the service station at approximately 8:55 p.m. While leaving the station, she observed Jeffrey Graham driving a Firebird automobile toward the station. Woodard testified that appellant was a passenger in Graham's automobile.

We find that there is a reasonable possibility that the improperly admitted evidence from Gustin contributed to appellant's conviction. For the improper admission of such evidence, the conviction must be reversed.

The State's motion for rehearing is denied.

## ON STATE'S MOTION FOR REHEARING

W.C. DAVIS, Judge.

A majority of this Court denies the State's motion for rehearing on the basis that the trial court committed reversible error in allowing certain evidence to be admitted.

The evidence in question consisted of the testimony of police officer Ivan Lenin Gustin as to "the victim's out-of-court declaration . . . that appellant was the individual who shot her." Briefly stated on April 9, 1979, at approximately 9:00 p.m., the victim, Linda Mae Rogers, was shot numerous times in the back at the Greenville service station at which she worked. Rogers was then taken by ambulance to Citizen's Gen-

eral Hospital where emergency surgery was performed that evening and again the next morning to remove two "missiles" from her body; one was removed from "the substance of the liver," and the other was removed from "the general area of the abdominal cavity of the liver."

The record reflects that Rogers suffered extensive injuries, described at one point by the treating physician as being "an accute injury, a massive injury." There was testimony by Dr. Goodman, the physician who later performed the autopsy, that there were either four or five entry wounds in Rogers' back. Her spinal cord had been severed by one of the bullets, causing paralysis in her lower extremities. Goodman further described Rogers' injuries by stating:

> "She died as a result of having sustained multiple injuries, secondary to multiple gunshot wounds which transected or cut in half the patient's spinal cord, penetrated her right chest and diaphram, penetrating the liver and the right kidney and the stomach."

At least two bullets, which the doctors were apparently unable to remove, remained in the thoracic cavity.

After the surgery was completed on the morning of April 10, Rogers was moved to the intensive care unit of the hospital where she was reported to be suffering great pain and discomfort. It was while Rogers was in this condition that the identification was made which is the basis of the majority's reversal.

At 8:50 a.m. on April 10, just a few short hours after this shooting victim had been taken out of surgery to repair her "massive, accute injuries," Officer Gustin entered the intensive care unit with six photographs in an attempt to have Rogers identify the people involved in the incident. It is clear that Rogers could not speak, but only move her lips and gesture with her hands. At this point, she identified appellant as the person who had shot her.

The majority reverses appellant's conviction on the basis that Officer Gustin's testimony concerning Rogers' identification con-

stituted inadmissible hearsay, and the trial court's admission of this identification amounted to reversible error. The State maintains that this testimony was admissible "as part of the victim's res gestae." I agree.

In finding the testimony inadmissible, the majority states:

"In the present cause, Rogers was shown appellant's picture some 12 hours after the offense. *The victim had been through surgery and was confined in the intensive care unit.* The State did not present evidence of Rogers' physical condition or state of mind at the time she spoke with Gustin. Under the circumstances presented, we are unable to conclude that Rogers' conduct was shown to be spontaneous and unreflective in nature. Therefore, Gustin's testimony concerning Rogers' conduct was not admissible as a res gestae statement or action of the victim." [Emphasis added].

In a determination as to whether an otherwise inadmissible hearsay statement should be admitted into evidence under the "excited utterance" exception, "the decisive factor is that the circumstances reasonably justify the conclusion that the remarks were not made under the impetus of reflection. Whether this conclusion is justified depends upon the facts of each case and must be determined by the trial court in the exercise of sound judicial discretion." *Martinez v. State,* 533 S.W.2d 20 (Tex.Cr.App. 1976). The basis for the "res gestae" or "excited utterance" exception is that in the proper situation, the declarant's statements gain reliability due to the lack of an opportunity in which to reflect back upon the events, or in which to contrive or formulate self-serving declarations. *Truck Insurance Exchange v. Michling,* 364 S.W.2d 172 (Tex. 1963).

As stated in *Freeman v. State,* 91 Tex. Cr.R. 410, 239 S.W. 969 (1922):

"The spontaneity of the statement or matter offered in evidence under said res gestae rule is the test and this may be arrived at by circumstances and the condition of the maker of such statements during the time which has elapsed since the occurrence or injury. Many authorities hold that when a condition of suffering exists from the infliction of the injury to the making of the statement in a given case it might extend far enough to preclude premeditation and in cases of this kind we have declined to be limited to any specific time." 239 S.W. at 970.

In the case at bar, it is evident that Rogers *was* suffering from the infliction of her injury from the time of the shooting until the time of the making of the statement. While it is true that the State put on no direct evidence of Rogers' mental state at the time she made the identification in question, the circumstantial evidence is ample to show that Rogers had little opportunity in which to reflect back upon the past events or to formulate self-serving or premeditated declarations. Also see *Ricondo v. State,* 475 S.W.2d 793 (Tex.Cr.App. 1971); *Fambro v. State,* 142 Tex.Cr.R. 473, 154 S.W.2d 840 (1941); *T.E.I.A. v. Shifflette,* 91 S.W.2d 787 (Tex.Civ.App.1936); *International Travelers' Ass'n v. Griffing,* 264 S.W. 263 (Tex.Civ.App.1924); *Davis Transport v. Bolstad,* 295 S.W.2d 941 (Tex. Civ.App.1956); *Dallas Hotel v. Fox,* 196 S.W. 647 (Tex.Civ.App.1917); *Missouri, K. & T. Ry. Co. of Texas v. Anderson,* 198 S.W. 795 (Tex.Civ.App.1917).

Further, the determination as to the admissibility of a declaration as res gestae is a question of fact for the trial judge, and one which he ought to have considerable discretion in deciding. Only in case of extreme and apparent abuse should the trial judge's ruling be disturbed on appeal. 1A Ray, Texas Evidence, 3rd ed., Sec. 917; *Truck Insurance Exchange v. Michling,* supra; *City of Austin v. Johnson,* 195 S.W.2d 222 (Tex.Civ.App.1946); *Gilmer v. Griffin,* 265 S.W.2d 252 (Tex.Civ.App.1954).

From the facts before us in the case at bar, I think it evident that at the time Rogers made the identification in question, she was in such a condition of suffering that the opportunity for a reflective, self-serving declaration was sufficiently reduced as to render Gustin's testimony admissible under the "res gestae" exception to the hearsay doctrine. The determination as to

the admissibility of the testimony is within the sound discretion of the trial judge, and I see no "extreme and apparent abuse" of that discretion.

For the foregoing reasons, I respectfully dissent to the reversal of the judgment.

CAMPBELL, J., joins in this dissent.

## ON STATE'S MOTION FOR REHEARING

CLINTON, Judge, dissenting.

After the Supreme Court of the United States reversed "in part" a judgment of this Court in a capital case, the Court deferred to a subsequent act of executive clemency that "reached the punishment before the judicial sequence did" and affirmed the judgment of conviction, citing only *Whan v. State,* 485 S.W.2d 275 (Tex.Cr.App. 1972). *Adams v. State,* 624 S.W.2d 568 (Tex.Cr.App.1981).

When *this* Court first reversed a judgment of a trial court assessing the death penalty for "trial error" during the punishment stage, but then granted leave to file motions for rehearing, and contemporaneously an executive proclamation was issued purporting to commute punishment at death to life, the Court thought executive clemency rendered our judgment such that "imposition of the death penalty is *no longer possible*"[1] and affirmed the judgment of conviction, after finding no error in the guilt-innocence stage of the trial; cited were *Adams v. State,* supra, along with two others similarly situated, and *Whan v. State,* supra. *Clark v. State,* 627 S.W.2d 693 (Tex.Cr.App.1982).[2]

In the cause before us now reversal first followed our discovery of "Witherspoon-Adams" error in exclusion of a juror, so a remand for a new trial with the death penalty as possible punishment was in order. Once again leave was granted the

State to file a motion for rehearing, and thereafter the Governor issued a proclamation which facially commuted punishment at death to life. Notwithstanding *that* "judicial sequence" reached the punishment before the Executive Department did, the opinion of the Court says, "In view of appellant's life sentence following the commutation," punishment errors are harmless. Then, drawing on language in *Whan v. State,* supra, the Court tells us, "When, as in the instant case, there is error in the guilt stage which affects the judgment, the commutation by the Governor, which relates to punishment only, is of no effect." Thus, the Court at once allows a purported commutation order to supercede its own reversal for "Witherspoon-Adams" error, but seems to declare the order ineffective with respect to "trial errors" on guilt.

It is readily apparent that *Whan* is ubiquitous. In the company of a purported commutation proclamation, it is found blocking the possibility—often likelihood—of imposition of capital punishment by the Judicial Department. Now is the time and this is the right opportunity to reexamine *Whan,* and I submit we should, indeed must, do so. Otherwise, as I demonstrated in *Adams,* usurpation of judicial power and authority to assess punishment and impose a death sentence in a capital murder case will surely continue—at the discretion of the Executive Department. Nullification of the death penalty is a matter for the people through established processes of our representative democracy, not one of administrative fiat. But *Whan* allows the latter.

The central fallacy in *Whan* is reflected by the following language:

"[Article 42.07,[3] V.A.C.C.P.] indicates that a pardon is valid even if granted before sentence is pronounced. The Governor's authority to grant commutation arises

---

1. All emphasis is mine unless otherwise indicated.

2. Dissenting in *Clark v. State,* supra, I suggested it was "perplexing" that "the commutation order preempted further judicial proceedings in *Adams,* but in this cause is 'suspended' pending judicial decision..."

3. In the allocution portion of a sentencing proceeding, the defendant may *prevent imposition* of sentence when he "has received a *pardon* from the proper authority" by presenting it, "legally authenticated," to the court.

from the same Article of the Constitution as does his authority to grant pardons. It follows that a commutation under the same circumstances would likewise be valid, the punishment having been assessed before sentence is pronounced, and therefore subject to commutation." *Id.,* at 277.

With deference, the conclusion of law reached does not follow from the premises expressed.

Let us suppose that after entry of judgment upon a jury's finding of guilt and assessing punishment at a term of forty years the Executive Department issued a proclamation purporting to commute that punishment to a term of twenty years confinement, but the defendant resisted by insisting on posttrial rights. *Whan,* drawing on language from two earlier opinions of the Court,[4] indicates that such commutation is valid since it is granted after "the verdict of guilty pronounced by a jury." Yet, judgment adjudicating guilt and assessing punishment has not been rendered and entered by the trial court. Therefore, I suggest there is nothing to commute, and, similarly, though judgment be entered on the verdict.

Commutation is "an executive act reducing the term of a *sentence* already imposed and substituting a lesser for the greater punishment," 67A C.J.S. § 4, p. 7; Black's Law Dictionary (Rev. Fourth Ed. 1968) 351. Thus, the constitutional term "after conviction" is of little moment with respect to commutation, for that kind of executive clemency simply may not attach "before conviction." "Commutation is . . . an act appropriate for reducing existing sentences . . .," 67A C.J.S. § 33b, p. 44.

On the other hand, unless otherwise restricted a pardon may be granted by proper authority at any time—even before a criminal charge has been lodged against the offender.[5] 67A C.J.S. § 12, p. 18. In Texas, however, when expressly limited, exercise of the power to pardon has always been restricted to "after conviction."[6] But that constitutional limitation is purely a reflection of a policy decision made by the people of Texas on the matter of timing valid exercise of the power to pardon.[7] Rather than permitting the Executive Department to grant pardons before charge is made, before indictment is returned, before trial begins, before jury verdict, the Constitution restricts the grant to that point in the criminal prosecution which is "after conviction." And there has never been any intimation that such restriction on timing is part of a definition of what constitutes a pardon.[8]

---

4. For fair criticism of *Snodgrass v. State,* 67 Tex.Cr.R. 615, 150 S.W. 162 (1912) and identification of the point in *Goss v. State,* 107 Tex. Cr.R. 659, 298 S.W. 585 (1927), see my dissenting opinion in *Clark v. State,* supra.

5. Grant of presidential clemency to Richard M. Nixon is a modern demonstration of the anticipatory nature of the power to pardon.

6. Plan and Powers of the Provisional Government of Texas, Article VII, 3 Vernon's Texas Constitution 513: ". . . and the penalties prescribed by said law, in case of conviction, shall be inflicted, unless the offender shall be pardoned, or fine remitted; for which purpose a reasonable time shall be allowed to every convict to make application to the Governor and Council." Constitution of 1836, Article VI, § 4, *id.,* at 529: "He shall have power to remit fines and forfeitures, and to grant reprieves and pardons..." Constitution of 1845, Article V, § 11, *id.,* at 555: ". . . he shall have power, after conviction, to grant reprieves and pardons; and under such rules of the Legislature may prescribe, he shall have power to remit fines and forfeitures; accord: Constitution of

1861, Article V, § 11, *id.,* at 584; Constitution of 1866, Article V, § 11, *id.,* at 614; Constitution of 1869, Article IV, § 11 *id.,* at 651; Constitution of 1876, Article IV, § 11, as originally adopted, *id.,* at 798, which for the first time mentioned "commutations."

7. *Camron v. State,* 32 Tex.Cr.R. 180, 22 S.W. 682 (1893) presented a problem of refusal of the prosecuting attorney to honor an agreement whereby an accused would "turn state's evidence against his confederate," raised by him through a plea in bar when put to trial. Noting that in some jurisdictions when an accused has testified as agreed but the prosecutor refuses to recognize the agreement, the trial court "will continue the cause, to let the defendant obtain a pardon to plead in bar," the Court found that practice inapposite in Texas "as the pardoning power can only be invoked after conviction. Const. art. 4, § 11."

8. Putting aside the several qualifiers often conditioning it, see Black's Law Dictionary, supra, 1269, the meaning of pardon in this country came from "that nation whose language is our

So, *Whan* is quite correct in perceiving that Article 42.07, V.A.C.C.P., "indicates that a pardon is valid even if granted before sentence." That article provides—as its predecessors did back to the former Article 688 in the 1857 procedural code—one reason to prevent *sentence* is:

"1. That the defendant has received a pardon from the proper authority, on the presentation of which, legally authenticated, he shall be *discharged*."

That reason obviously contemplates only a pardon in the classic sense, one which absolves from punishment and "whatever else the law has provided," *Carr v. State*, supra, at 657, and the mandate of discharge clearly excludes operation of a commutation order. There is not the slightest suggestion in Article 42.07, or elsewhere, that receiving commutation is a reason the defendant may advance to prevent sentence.

*Whan* also observed that the authority bestowed on the Governor to grant commutations "arises from the same Article of the Constitution as does his authority to grant pardons." But the observation, while absolutely accurate, is pointless. As already shown *ante*, the constitutional provision is a matter of timing exercise of pardoning power, not a matter of defining the kinds of executive clemency mentioned in the section. Indeed, except for pardons the term "after conviction" is redundant for the other kinds, facially or by definition, necessarily require conviction and punishment.[9]

Neither reprieve, commutation, fine nor forfeiture precedes a finding of guilty or "conviction," and the authority of the Governor to grant any of those kinds of clemency could have been provided effectively anywhere in Article IV—or anywhere in the Constitution—without the words "after conviction."

Thus, the conclusion reached in *Whan* does not "follow" its premises. Furthermore, omitted from its analysis are pertinent factors that seem to have been overlooked.

The functional distinction between a pardon and commutation, along with other kinds of executive clemency, has been legislatively and administratively provided. In Article 42.12, § 25, V.A.C.C.P., the Legislature authorized the Board of Pardons and Paroles (Board) to "investigate and report to the Governor with respect to any person being considered by the Governor for . . . commutation of *sentence*." In turn, the Board, with another grant of authority to do so, *id.*, at § 18, has adopted rules pertaining to its investigative and reporting functions in this respect, within the constraints of its own definition, *viz:*

" 'Commutation of *sentence*' means an act of clemency by the governor which serves to modify the conditions of a *sentence*."[10]

Constitutionally and statutorily, the Governor may not commute (or pardon, for that

---

language, and to whose judicial institutions ours bear a close resemblance," *United States v. Wilson*, 7 Peters 150, 160, 8 L.Ed. 640 (1833), *viz*:

"A pardon is an act of grace, proceeding from the power intrusted with the execution of the law, which exempts the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed."

Early on, the view of Texas was similar, see *Carr v. State,* 19 Cr.R. 635, 357, 660, 663 (Ct. App.1885) and *Bennett v. State,* 24 Cr.R. 73, 5 S.W. 527, 529 (Ct.App.1887), and it still is.

**9.** The second paragraph of Article IV, § 11 contains the operative bestowal of power "after conviction . . . to grant *reprieves* and *commutations* of punishment and pardons . . . and . . . to remit *fines* and *forfeitures*."

**10.** Rules, § 141.111(.005). Rules and regulations promulgated by an administrative agency, acting within authority delegated to it by statute, are to be construed as statutes. *Nacogdoches Savings and Loan Assn. v. Lewis,* 531 S.W.2d 428, 430 (Tex.Civ.App.—Austin 1975) reversed on other grounds, 540 S.W.2d 313 (Tex.1976) pursuant to disposition of *Lewis v. Jacksonville Building and Loan Assn.,* 540 S.W.2d 307 (Tex.1976), in which at 310, the Supreme Court confirmed: "Valid rules and regulations promulgated by an administrative agency acting within its statutory authority has the force and effect of legislation. [citations omitted] Administrative rules are ordinarily construed like statutes." (Though the rule alluded to has been more recently promulgated under the Administrative Procedure and Texas Register Act, Article 6252–13a, V.A.C.S., the former regulations were the same in substance.)

matter) except on the written signed recommendation of the Board. Article IV, § 11, supra, and Article 48.01, V.A.C.C.P. By statute and its own rules the Board is authorized to make its recommendation for commutation of *sentence* only. It follows that assessed punishment is not subject to commutation in advance of sentence.

Finally, when *Whan* was decided Article 42.07, supra, also provided another reason to prevent sentence, towit:

"3. Where there has not been a motion for new trial or a motion in arrest of judgment made, the defendant may answer that he has good grounds for either or both of these motions and either or both may be immediately entered and disposed of . . ."

The effect of granting a new trial is obvious, but overlooked often is the consequence of the effect of arresting judgment provided in Article 41.05, V.A.C.C.P. The defendant is placed in the same position he was before the indictment was presented, but if the trial court is not satisfied from the evidence that he may be convicted again "the defendant shall be *discharged*." To hold that a purported commutation may attach to punishment fixed in a judgment of the court that is still subject to being arrested and the accused discharged from all punishment would be such a deprivation of constitutional and statutory rights that the point need not be belabored. Yet, that is clear result of *Whan's* dictum that punishment having been assessed before sentence is pronounced "a commutation under the same circumstances [as a pardon] would likewise be valid."

Today the Court finds that the judgment of conviction must be reversed on account of trial error, much as the trial court could have done on appellant's motion for new trial, under Article 42.07 or regular procedure in Chapter Forty with its effect—"to place the cause in the same position in which it was before any trial had taken place," Article 40.08, V.A.C.C.P. But whether the death penalty is still available, as it clearly was following reversal on original submission, is not revealed by the Court, and, either way, the Court should so state. With deference, a valid commutation order

is effective for all its intended purposes, or for none. The Court has given it the effect of rendering harmless errors during punishment; but if it is not operative beyond that interference with the judicial process, then its intended purpose has not been achieved and granting it in the first place was a futile endeavor. To the extent that *Whan* and its progeny produce such curious consequences, they should be overruled. I am simply unable to subscribe to the proposition that a purported commutation of the punishment portion of a judgment that is to be reversed renders "imposition of the death . . . penalty no longer possible."

Accordingly, I dissent.

ONION, P.J., and TEAGUE, J., join.