**Reversed and Rendered and Memorandum Opinion filed February 20, 2014.**



In The

# Fourteenth Court of Appeals

### NO. 14-12-00675-CV

## IN THE MATTER OF J.W., A JUVENILE

**On Appeal from the 313th District Court at Law**
**Harris County, Texas**
**Trial Court Cause No. 2012-01177J**

## M E M O R A N D U M   O P I N I O N

Appellant J.W. was charged with aggravated robbery. After a bench trial, the trial court found that J.W. engaged in delinquent conduct; removed J.W. from his home; and placed J.W. in the custody of the Harris County Juvenile Probation Department until his eighteenth birthday. J.W. contends on appeal that (1) the trial court erred by failing to suppress the statement he made to the police; and (2) the evidence was insufficient to support the trial court's adjudication that he "engaged in delinquent conduct constituting a penal offense." The State concedes on appeal that the evidence is legally insufficient to support the trial court's adjudication.

After independently reviewing the record, we reverse the trial court's adjudication and disposition order and render judgment that the petition alleging delinquent conduct be dismissed with prejudice.

## BACKGROUND

While investigating a string of car thefts and robberies that had occurred in mid-January 2012, Houston Police Department Officers Michael Lareau and Robert Moss picked up sixteen-year-old J.W. at his apartment for questioning on January 24, 2012. The officers had been to J.W.'s apartment before. J.W. agreed to ride with Moss and Lareau to a nearby police station for an interview.

Moss and Lareau took J.W. to a small room at the police station for a videotaped interview; Lareau told J.W. to "walk me through everything you know." Lareau said it was J.W.'s chance to tell the truth about everything he was involved with and knew. Moss and Lareau told J.W. that he was not under arrest and was free to leave at any time. J.W. told the officers what he knew about certain events relating to car thefts and robberies.

J.W. began by telling the officers that his friend, Alton, had told J.W. that Alton and a person named Qualon robbed a man at gunpoint of a silver Saturn automobile two days before Martin Luther King Jr. Day.[1] That same day, Delvin stole a red Chrysler at a store when the owner had left the car keys in the car. Lareau accused J.W. of stealing the red Chrysler with a person named Elroy, driving it all night, and then wrecking it; J.W. denied taking anything and insisted that Delvin stole the red Chrysler and drove it all night. When Lareau asked J.W. about a white Explorer, J.W. stated that he was not present when Alton and his

---

[1] J.W. has a number of friends and acquaintances who play a part in the narrative but whose individual identities do not play a part in our analysis. They include Alton, Qualon, Delvin, Elroy, Ryan, Dedrick, Tray, "Money," "Pro," "Bank," Markel, and Tatiana.

friends Ryan and Dedrick stole a white Explorer.

J.W. told the officers that Alton knocked on J.W.'s apartment door later that same day as J.W. and his friend Tray were getting ready to go to bed. J.W. came outside and saw the red Chrysler, a red Lexus, a white truck, and a gold Honda SUV. J.W. got in the backseat of the red Lexus, Delvin drove it, and Tray sat in the front seat.

J.W. told the officers that he asked to go home when he found out that the Lexus had been stolen. Lareau responded by telling J.W. not to try to "separate himself from it" because the police knew he is "in it." J.W. maintained that he went home after stopping at a friend's house. Moss then warned J.W. not to start telling lies; J.W. insisted that he did not rob anybody, he did not steal any cars, others stole cars, and he "just rode with them." J.W. also stated that he did not know who stole the red Lexus or the gold Honda SUV.

J.W. acknowledged joining his friends "Money," "Pro," and Dedrick at some point later in the evening to drive around in the stolen red Lexus. They were joined by J.W.'s friends "Bank," Alton, and Ryan, who drove in the stolen gold Honda SUV; they also were joined by Delvin, Tray, and Markel, who drove in the stolen red Chrysler. J.W. stated that they all drove around Houston. When they stopped at a traffic light on Hillcroft Avenue, his friends decided to use their cars to "box in" a Lexus that also was stopped at the light. J.W. stated there was no plan to "box in" the Lexus, and his friends "just did it." When the Lexus drove off, J.W. saw "Bank" shooting at it.

J.W. stated that everyone continued to drive around Houston for a while and then returned to J.W.'s apartment complex. "Bank," Dedrick, and Ryan went home, and the others sat around at the apartment complex for about thirty minutes. J.W. stated that he, "Pro," "Money," Delvin, Tray, Alton, and Markel then drove to

Walmart in the red Lexus and red Chrysler. J.W. stated that some of his friends "stole some condoms" at Walmart. Thereafter, Tray and Delvin got into the red Chrysler, and J.W., "Pro," "Money," Alton, and Markel got into the red Lexus and continued driving around. When Tray wrecked the red Chrysler, he and Delvin joined the others in the red Lexus and they continued driving around.

J.W. stated that they saw a black Mustang at a light on the 610 Loop feeder road. J.W. stated that Delvin said, "I want that car," and "Money" pulled up beside the Mustang. Delvin then put a mask on his head; got out of the Lexus with a shotgun in hand; ran to the driver's side of the Mustang; and told the driver, complainant Jose Rodriguez, to get out of the Mustang. Complainant got out of his car and ran away. In the meantime, Alton also got out of the Lexus, ran to the Mustang, and sat in the passenger seat. Delvin and Alton then drove away in the Mustang while J.W. and the remaining friends drove back to J.W.'s apartment complex. J.W. stated that he and Tray went to J.W.'s apartment to sleep, and the others drove away in the Lexus.

Officer Lareau accused J.W. during the interview of knowing that all "these things are wrong and illegal;" although J.W. agreed with Lareau, J.W. also stated, "I didn't tell them to do it." When Lareau told J.W. that he got into a stolen Lexus; drove around in it with his friends; went to Walmart; and "then you go and commit a robbery," J.W. immediately responded, "I didn't, they did." After the interview, the officers locked J.W. in the interview room for a short period of time and then drove him back to his apartment.

The State filed a petition on February 16, 2012, alleging that J.W. engaged in delinquent conduct by committing an aggravated robbery — specifically, by threatening complainant Jose Rodriguez with a firearm in the course of stealing his black Mustang. On May 23, 2012, the trial court held a hearing on J.W.'s motion

4

to suppress the statements he made during his police interview. The trial court denied J.W.'s motion to suppress on the same day, and thereafter a bench trial was held.

At the bench trial, the complainant testified that his black Mustang was taken at gunpoint while he was stopped at a red traffic light on the 610 feeder road at about 7:25 a.m. on January 16, 2012. The complainant testified that a masked gunman exited a car that was stopped next to his Mustang; the gunman came to his window; pointed a shotgun at him; and yelled at him to hand over his wallet and get out of the car. The complainant testified that he exited his Mustang and ran away; he saw another masked gunman exit a car and then sit in the passenger side of his Mustang. The complainant testified that he could not say whether J.W. had anything to do with the aggravated robbery, and that he could not recognize J.W. as someone who had any part in the aggravated robbery or "was even there."

Houston Police Officer Alex Hanva Magnan testified that she was on patrol in southeast Houston the night of January 16, 2012. When she stopped behind a black Mustang at a traffic light, she ran a license plate check and received a "suspicious vehicle hit." Magnan testified that she followed the Mustang and initiated a traffic stop; the Mustang did not stop and ran a stop sign. At some point, the Mustang stopped and all the occupants, who appeared to be young black males between ten and sixteen years of age, fled the Mustang. One of the occupants was a black female named Tatiana, whom Magnan took into custody. Tatiana mentioned Alton and told Magnan that the boys who fled the Mustang were running to "Norma's Plaza" apartment complex — the apartment complex at which J.W. lived. Other police officers arrived at the scene, and Magnan directed the officers to the apartment complex because she was familiar with its location.

Magnan testified that Tatiana directed the officers to J.W.'s apartment and

5

pointed it out as the place to which the males were fleeing. When Magnan and the other officers arrived at the apartment complex, they observed three or four young black males fleeing into J.W.'s apartment. Magnan testified that she and other police officers entered J.W.'s apartment and found J.W., his mother, and about six other young black males in the apartment. She testified that officers detained all the young males outside the apartment for safety purposes as officers investigated inside the apartment. She stated that J.W. was then released because the officers did not have probable cause to arrest him. Magnan also testified that she did not know if J.W. was one of the young males who had earlier fled the Mustang.

Officer Lareau testified about J.W.'s statements to him during his interview at the police station. J.W. told Lareau that he and his friends had returned to his apartment after shooting at a Lexus at Hillcroft Avenue, and "that's when they decided to go back out and get another car. And Delvin said he wanted that [black Mustang]. They were looking for cars, and Delvin said, I want that car." J.W. also told Lareau that Delvin had a shotgun during the robbery, and that Delvin and Alton drove off in the complainant's black Mustang.

Lareau acknowledged during cross-examination that he interpreted J.W.'s statements at the police station to mean that J.W. and his friends had gone to J.W.'s apartment to plan another carjacking, and that they "had all gotten into cars to go get more cars." Lareau testified that J.W. never used the word "we;" instead, he used the word "they" whenever he talked about the events surrounding the Mustang robbery. Lareau stated, "As you can see in [J.W.'s] statement, he clearly attempts to separate himself the entire time." When Lareau was asked during cross-examination whether J.W. ever "admit[ted] doing anything with the robberies other than watching this one occur with the Mustang? Did he ever admit any participation in any way, shape, or form?[,]" Lareau responded that J.W. only

6

"admitted to going with them."

On re-direct examination, Lareau testified that J.W. had stated in his interview that he and his friends had been at his apartment planning to car jack another car; that J.W. "knew of the plan to go rob a car;" and that "the next car that [wa]s car jacked in that plan [wa]s a black Mustang."

The trial court admitted J.W.'s videotaped interview into evidence and stated it would review the interview again before making its ruling. On May 24, 2012, the trial court signed an adjudication and disposition order finding J.W. engaged in delinquent conduct; the trial court removed J.W. from his home; and placed J.W. in the custody of the Harris County Juvenile Probation Department until his eighteenth birthday. J.W. filed a motion for new trial on June 4, 2012. J.W. filed a timely appeal on July 19, 2012.

## ANALYSIS

J.W. argues in his first issue that the trial court erroneously denied his motion to suppress the statement he made to the police. In his second issue, J.W. contends that the evidence is insufficient to support the trial court's judgment that appellant engaged in delinquent conduct constituting a penal offense.

We must address sufficiency challenges regardless of our disposition of the other issues in a case. *In re R.R.*, 373 S.W.3d 730, 734 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *see Graham v. State*, 643 S.W.2d 920, 924 (Tex. Crim. App. 1981). Accordingly, we begin our analysis by examining J.W.'s second issue.

Although juvenile proceedings are civil matters, the standard applicable in criminal matters is used to assess the sufficiency of the evidence underlying a finding the juvenile engaged in delinquent conduct. *In re R.R.*, 373 S.W.3d at 734.

7

The State is required to prove each element of a criminal offense beyond a reasonable doubt, and the reviewing court uses a legal sufficiency standard in determining whether the evidence is sufficient to support the State's assertions. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013).

When reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the underlying factual determination to determine whether, based on that evidence and the reasonable inferences therefrom, a factfinder was rationally justified in finding guilt beyond a reasonable doubt. *See id.* This standard of review applies to cases involving both direct and circumstantial evidence. *In re R.R.*, 373 S.W.3d at 735 (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

The trial court, as the trier of fact in a bench trial, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Joseph v. State*, 897 S.W.2d 374, 376 (Tex. Crim. App. 1995). We presume the factfinder resolved conflicting inferences in favor of the verdict, and defer to that determination. *Id.* We also determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Id.*

A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. Tex. Penal Code Ann. § 29.02(a)(2) (Vernon 2011); *Wyatt v. State*, 367 S.W.3d 337, 340 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd, untimely filed). A person commits aggravated robbery if he commits robbery and uses or exhibits a deadly weapon. Tex. Penal Code Ann. § 29.03(a)(3) (Vernon 2011); *Wyatt*, 367 S.W.3d at 340. A firearm is a deadly weapon. Tex. Penal Code Ann. § 1.07(a)(17)(A)

8

(Vernon Supp. 2013); *Wyatt*, 367 S.W.3d at 340.

"A person is a criminally responsible party to an offense 'if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.'" *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (quoting Tex. Penal Code Ann. § 7.01 (Vernon 2011)). "A person is criminally responsible for the conduct of another if, acting 'with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.'" *Id.* (quoting Tex. Penal Code Ann. § 7.02 (Vernon 2011)).

To determine whether an individual is a party to an offense, we may look to events before, during, and after the commission of the offense. *Id.* We also may look to circumstantial evidence to determine party status. *Id.* Post-offense conduct is relevant but cannot stand alone; there also must be sufficient evidence of an understanding or common design to commit the offense. *Id.* at 188. "Each fact need not point directly to the guilt of the defendant, as long as the cumulative effect of the facts [is] sufficient to support the conviction under the law of parties." *Id.* at 186. Intent may be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). A defendant's mere presence at the crime scene, or even flight from the scene, "without more, is insufficient to support a conviction as a party to the offense." *Gross*, 380 S.W.3d at 186.

J.W. contends that there is no evidence to support a finding that J.W. is criminally responsible under the law of parties for the conduct of those who committed the offense of aggravated robbery. J.W. contends that even if he had known about a plan to commit the aggravated robbery and accompanied the perpetrators, there is no evidence that he committed an act that promoted or

assisted the others in committing the subject offense.

On appeal, the State agrees with J.W. that this issue should be sustained and concedes that there is legally insufficient evidence to "establish [J.W.]'s participation as a party to the aggravated robbery of Jose Rodriguez." The State agrees that the evidence is legally insufficient to establish that J.W. "performed any act to solicit, encourage, direct, aid, or attempt to aid in the aggravated robbery of Jose Rodriguez with the intent to promote or assist in the commission of the offense." The State concedes that the "only act" J.W. committed was "riding in a stolen car with his friends who eventually committed the aggravated robbery at issue."

Notwithstanding the State's concession, we are obligated to review the evidence independently and have done so. *See Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App. 2002). After reviewing the evidence presented at the bench trial, including J.W.'s videotaped interview, we agree with J.W. and the State that the evidence is legally insufficient to support a finding that J.W. is criminally responsible as a party to the aggravated robbery of the complainant.

At the bench trial, the complainant testified that a masked gunman robbed him of his black Mustang in the early morning on January 16, 2012. The complainant testified that he could not say whether J.W. had anything to do with the aggravated robbery, and that he could not recognize J.W. as someone who had any part in the aggravated robbery or "was even there."

Officer Magnan testified that on January 16, 2012, she initiated a traffic stop after she saw the Mustang stopped at a traffic light and a license plate check on the Mustang yielded a "suspicious vehicle hit." Magnan testified that three black young males abandoned and fled the Mustang but she could not identify J.W. as one of the males who fled.

The evidence further showed that, according to J.W.'s videotaped statement, J.W. and several of his friends were riding around Houston in stolen vehicles, including a red Lexus. When J.W.'s friend, Delvin, saw the complainant's Mustang stopped at a traffic light, he stated, "I want that car." The driver of the Lexus, "Money," immediately pulled up beside the Mustang. Delvin then put a mask on his face; got out of the Lexus armed with a shotgun; ran to the driver's side of the Mustang; pointed the shotgun at the complainant; and told the complainant to get out of the Mustang. Although J.W. agreed with Officer Lareau during his interview that "when Delvin went to get the Mustang, you knew he was going to commit a robbery," this is not evidence of a prior or contemporaneous plan between J.W. and Delvin or any other of his friends to commit the aggravated robbery. *See Gross*, 380 S.W.3d at 188 (evidence was legally insufficient to support conviction because a prior or contemporaneous plan to commit the offense could not be inferred from the evidence).

According to Officer Lareau's trial testimony, J.W. stated during his interview that he and his friends had returned to his apartment after shooting at a Lexus at Hillcroft Avenue and "that's when they decided to go back out and get another car. And Delvin said he wanted that [black Mustang]. They were looking for cars, and Delvin said, I want that car." We have reviewed J.W.'s videotaped statement; nothing in the statement supports an assertion that J.W. decided with his friends to "go back out and get another car." Equally unsupported are the assertions that J.W. stated he and his friends had been at his apartment planning to carjack another car; that J.W. "knew of the plan to go rob a car;" or that "the next car that [wa]s car jacked in that plan [wa]s a black Mustang."

Lareau acknowledged during cross-examination that he interpreted J.W.'s statements at the police station as meaning that J.W. and his friends had gone to

J.W.'s apartment to plan another carjacking, and that they "had all gotten into cars to go get more cars." Lareau agreed that J.W. never used the word "we" and instead used the word "they" whenever he talked about the events surrounding the Mustang robbery. Lareau stated, "As you can see in [J.W.'s] statement, he clearly attempts to separate himself the entire time." When Lareau was asked during cross-examination whether J.W. ever "admit[ted] doing anything with the robberies other than watching this one occur with the Mustang? Did he ever admit any participation in any way, shape, or form?[,]" Lareau responded that J.W. only "admitted to going with them."

The evidence in this case does not show that J.W. affirmatively planned the aggravated robbery or did anything to solicit, encourage, direct, aid, or attempt to aid Delvin or anyone else in the commission of the aggravated robbery. The evidence does not show that J.W. was the get-away driver; instead, it shows that J.W. was a passenger sitting on the middle console of the stolen Lexus during the robbery. The evidence does not show that J.W. fled from the police at any time. The evidence shows nothing more than J.W.'s presence in a stolen Lexus at the scene of the aggravated robbery. As the Court of Criminal Appeals has stated, "[m]ere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense." *Id.* at 186.

In *Gross*, the Court of Criminal Appeals unanimously held that the evidence of defendant Gross's involvement in a shooting was legally insufficient to support a conviction for murder under the law of parties despite Gross's presence at the crime scene; Gross's possession of the murder weapon that was used by his brother-in-law Jones; Gross's assumption that Jones knew Gross kept a shotgun in his truck; and Gross's efforts to help Jones flee the scene to dispose of the shotgun

he used to kill the victim. *Id.* at 187-89. Evidence showed that Gross and Jones were driving home from a club when Gross stopped his truck to let the victim's car exit a parking lot. *Id.* at 183. The victim and Gross started a verbal altercation, and the victim asked Gross to pull into the parking lot of a gas station. *Id.* There, Gross and the victim exited their respective vehicles and continued arguing. *Id.* Jones thereafter also exited Gross's truck; he was armed with a shotgun and pointed it at the victim. *Id.* Gross knew that the gun had been stored in his truck, but he did not own it. *Id.* Gross shouted, "No, no." *Id.* Jones shot the victim. *Id.* Gross drove away with Jones and the gun; Gross dropped Jones and the gun off at his grandmother's house. *Id.* 183-84. When the police questioned Gross pursuant to a warrant, he denied any involvement in the murder and did not mention Jones. *Id.* at 184.

The Court of Criminal Appeals agreed with this court's determination that the evidence was insufficient to support Gross's conviction under the law of parties. *Id.* at 188. The Court of Criminal Appeals stated that, even viewing the evidence cumulatively, it could not conclude that a rational jury could find beyond a reasonable doubt that Gross was involved in a prior or contemporaneous plan to shoot the victim. *Id.* at 189.

Considering the Court of Criminal Appeals's holding in *Gross*, we cannot conclude that an inference can be made from the evidence in this case that J.W. planned the aggravated robbery or did anything to solicit, encourage, direct, aid, or attempt to aid anyone else in the commission thereof. Having reviewed all the evidence in this case, we conclude that the evidence is legally insufficient to support a finding that J.W. is a criminally responsible party to the aggravated robbery of the complainant and, thus, no evidence to support a finding that J.W. engaged in delinquent conduct. We sustain the second issue.

13

## Conclusion

We reverse the trial court's adjudication and disposition order and render judgment that the petition alleging delinquent conduct be dismissed with prejudice. *See In re Garza*, 984 S.W.2d 344, 347 (Tex. App.—Amarillo 1998, no pet.).[2]

/s/    William J. Boyce
        Justice

Panel consists of Chief Justice Frost and Justices Boyce and Jamison.

---

[2] In light of our disposition, we need not address J.W.'s remaining issue.